13 N.J. Super. 63 (1951)
80 A.2d 246
BOOST COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
RANDLE B. FAUNCE, E. LESTER STOCKTON, SR., RANDLE N. FAUNCE, E. LESTER STOCKTON, JR., AND DRINK ATOAST, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 29, 1951.
*65 Mr. W. Louis Bossle, for plaintiff.
*66 Mr. Charles A. Cohen for the defendants (Messrs. Worth & Worth, attorneys).
HANEMAN, J.S.C.
Plaintiff herein seeks to obtain an injunction against the defendants in the following respects: (1) from manufacturing, advertising or selling a certain soft drink known as "Atoast"; (2) from using the name "Atoast"; (3) from using the bottle allegedly imitative of that of a soft drink manufactured and sold by the plaintiff; (4) from using the label allegedly imitative of that used by plaintiff; (5) from using the color of the syrup allegedly imitative of that used by plaintiff; (6) in general, from falsely representing their product as that of plaintiff's and for discovery of profits and recovery of damages resulting from the foregoing.
The facts as set forth in the complaint are as follows: The plaintiff was incorporated on May 15, 1915 and from that time has been manufacturing and selling a certain soft drink or syrup known as "Tak-Aboost." This product was manufactured in accordance with an allegedly secret formula originated and perfected by one Benjamin R. Faunce, who sold said formula to the plaintiff and who, until his death on April 27, 1949, was plaintiff's president. The said Benjamin R. Faunce allegedly informed his sons, the defendants Randle B. Faunce and E. Lester Stockton, Sr., who were then plaintiff's employees, of said secret formula. Shortly after the death of the said Benjamin R. Faunce the said Randle B. Faunce and E. Lester Stockton, Sr., who were stockholders in plaintiff's corporation, had a falling out and disagreement with B. Paul Faunce, also a son of Benjamin R. Faunce and Maude F. Faunce, widow of Benjamin R. Faunce. Thereafter, on or about January 3, 1950 the defendants disassociated themselves from the plaintiff and incorporated "Drink Atoast," a corporation of the State of New Jersey, and commenced the manufacture of a soft drink or syrup which was sold in competition to that manufactured by the plaintiff, and known as "Atoast."
*67 Although the cause was tried upon the theory that the plaintiff manufactured its product under a secret formula which became known to Randle B. Faunce and E. Lester Stockton, Sr., while they were employees of the plaintiff, the complaint alleges as follows:
"20. The defendants' product is not identical with plaintiff's; and, while it is otherwise imitative of plaintiff's product, defendants' product does not have the same taste."
Plaintiff's alleged basis for relief is, as expressed in its brief, a breach of trust on the part of defendants. Plaintiff contends that the defendants having acquired knowledge of a secret formula by reason of their confidential relationship, cannot utilize that secret or any variation of it to manufacture a product for the trade, in competition with plaintiff. Plaintiff seeks as well to restrain the defendants from alleged unfair trade practices, but also relies upon them as augmenting such breach of trust.
In order for plaintiff to succeed on its primary complaint in the restraint sought against defendants from the manufacture of the soft drink in which they are now engaged, it is elemental that there must be in existence a secret now being used by plaintiff, and which, or some variation of which, is being used by the defendants. After this has been established, plaintiff must bear the burden of proving that the defendants obtained the information or knowledge required to compound the soft drink, which they are manufacturing, in such a manner as would make them guilty of a breach of trust or confidential relationship by its use. Stone v. Grasselli Chemical Co., 65 N.J. Eq. 756 (E. & A. 1903); Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387 (E. & A. 1906); Maas & Waldstein Co. v. Walker, 100 N.J. Eq. 224 (Ch. 1926).
Restatement of the Law, Torts, sec. 757, p. 6, defines a trade secret as follows:
"Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the *68 information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."
Also, Restatement of the Law, Torts, sec. 757, p. 5, as follows:
"b. Definition of trade secret. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business (see sec. 759) in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally, it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.
"Secrecy. The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. * * *"
The defendants do not dispute the proposition as advanced by plaintiff, i.e., that one who learns a trade secret by reason of a confidential relationship with the proprietor thereof may not divulge it or use it for his own benefit.
Plaintiff admits that if it were not for the breach of confidence the defendants would have the right to manufacture not only a product similar to plaintiff's, but even plaintiff's identical product.
*69 The initial inquiry is, therefore, whether a trade secret or secret formula in fact exists.
The secret may consist of any one or all of the following  the ingredients, the proportions of ingredients, or method of combining or mixing the ingredients. Plaintiff relies upon the entire formula containing all three elements.
The sole witness for plaintiff who testified as to the formula now used by it was Benjamin Paul Faunce, the next to the last witness to testify. His stepmother, who was the last witness, added very little to the case. Then, for the first time, did it become apparent that Randle R. Faunce, the originator of the alleged secret formula, had reduced the same to writing. When confronted with this evidence, Benjamin Paul Faunce was forced to produce the formula, which was in the custody of the stepmother. This is the alleged formula upon which plaintiff relies. He admitted that the instructions contained in this paper were insufficient to manufacture Tak-Aboost. In addition, he admitted that the formula was changed from the time it was originally written and that actually he himself had to experiment with the ingredients until he came up with the result he now uses. In reference to his father's formula, the witness said:
(Page 201)
"Q. From time to time through the years has there been any change in the formula? A. Yes, quite a few.
Q. Do you recall some of the changes? A. Yes, I know that around ten years ago there was more citric acid added and in that way you could cut down a little on the oil of lemon."
(Page 209)
A. I knew the ingredients.
The Court: The proportions?
The Witness: Not exactly, they were varied a lot, they were changed from time to time, my father did that, he was known for that.
Q. Well, how do you know they were changed if you didn't know the first proportion, the first set of proportions? A. I would know them and he would decide to change something, add a little more, or take a little out."
(Page 236)
"By The Court:
Q. Let me ask you something. This formula you gave in answer to Mr. Bossle's questions isn't the percentage or proportion of ingredients your father gave you, is it? A. No.
*70 Q. That is something you have developed since the first of the year yourself, is that so? A. Not exactly, Judge, he changed things around a lot.
Q. Do you mean there was never any final formula, he never told you what the final formula was? A. No, he changed it.
Q. Did he ever have any final formula? A. Not that I know of."
The written formula P-H-3 was alleged to be the secret and yet it was admitted that Tak-Aboost could not be compounded therefrom.
I am satisfied that there never was a permanent formula for Tak-Aboost. I am convinced that Benjamin R. Faunce, during his lifetime, changed the formula at irregular periods and that Benjamin Paul Faunce, since January 1950, has experimented and has developed his own formula. There never was any set, fixed formula. I find that the formula now used by the plaintiff is neither the formula which was being used at the time of the death of Benjamin R. Faunce, nor that any final formula existed at the time of his death.
An analysis of the ingredients of the two alleged formulae demonstrate that the ingredients were (1) different in some particulars and (2) where identical, were used in different proportions.
The testimony of Randle B. Faunce as to the ingredients of Tak-Aboost at the time he disassociated himself from plaintiff, and the testimony of Benjamin Paul Faunce as to the ingredients at the time of trial, demonstrates the following comparison with the Atoast formula:

Ingredients: Tak-Aboost Tak-Aboost Atoast
 110 gals. 103 gals. 100 gals.
 per Randle per Paul
Sugar 600 lbs. 500 lbs. 600 lbs.
Caramel To color 1 1/8 gal. 8 to 16 qts.
Water To make To make To make
 110 gals. 103 gals. 100 gals.
Caffeine 8 oz. 7 oz. 15 oz.
Citric Acid 3 lbs. 12 oz. 4 lbs. 5 oz. 4 lbs. 8 oz.
Tartaric Acid 22 oz. 17 oz. 10 oz.
Phosphoric Acid 10 oz. 8 1/2 oz. 5 oz.
Mace Extract 15 oz. 1/2 oz. None
Oil of Lemon-cut 28 drams 24 oz. (145 drams) 11 1/4 drams
Oil of Lemon 5X None None 1 dram
Oil of Lime None None 4 drams

*71 Approximately 99% of the syrup from which soft drinks are made is composed of sugar (including caramel) and water. Since this is so, the secret must lie in the 1% balance.
In compliance with the federal pure food laws, the label affixed to the bottles containing plaintiff's product recites the following:
"A beverage syrup prepared with sugar, water, caffeine, phosphoric acid, fruit acid and other flavoring material colored with caramel."
The only ingredients in either of the formulae which are not disclosed by this statement are citric acid, tartaric acid, oil of lemon (all common to both formulae), mace extract (present in plaintiff's formula) and oil of lemon 5X and oil of lime (both present in defendants' formula). All of these are flavors and are commonly used in soft drinks, with perhaps the exception of mace, which is present only in plaintiff's syrup and of which defendants cannot be accused of illegal use. The proportions used in both formulae of these syrups are entirely different. Although the two resulting soft drinks may have a somewhat similar taste (although this is doubtful, from the testimony), the predominant flavor of each is lemon. Any member of the public, with access to recognized texts, could develop a drink resembling that of plaintiff's. Since the testimony satisfies me that there never existed a fixed, final formula by which plaintiff's drink was manufactured, the question arises  are the defendants, because of having had some connection with the plaintiff, forever barred from manufacturing a soft drink which has a flavor resembling that of plaintiff's drink, although the ingredients and proportions thereof are different in the two drinks, and the ingredients are those of popular knowledge? The effect of what plaintiff says is that once having worked for it, defendants cannot ever make any soft drink having a lemon flavor.
The ingredients used by defendants were those of common knowledge to any one in the soft drink industry. The plaintiff failed to prove that the method of combining the *72 ingredients was of a secret nature. In addition, the ingredients themselves used in the two formulae were different.
In view of the foregoing, plaintiff's suit for an injunction against manufacture will be denied.
We come, therefore, to the question of unfair competition, the basis of which, as stated by plaintiff, is expressed in National Biscuit Co. v. Pacific Coast Biscuit Co., 83 N.J. Eq. 369 (Ch. 1914), as follows:
"The law relating to fraudulent or unfair competition between traders is so firmly established and has been so lucidly illustrated and defined by the courts of England and of this country, that extended citation of authorities will be profitless. The underlying principle that no man has a right to palm off his wares as those of another, thereby cheating the purchasing public and filching the business of a rival, is so essentially an element of natural justice and so solidly imbedded in our jurisprudence, that all that is necessary to quicken a court of equity, is to show that in the particular instance the offence has been committed. The cases cited by counsel in their briefs exemplify the illimitable conditions and circumstances under which this simple doctrine requiring men to be honest towards each other may be invoked." * * *
"Generally, as to size and shape and capacity (and the fifteen cartons of the complainant differ in these respects), it may be said that the defendant's cartons are exact and substantial counterparts of the complainant's. The red-end seal on both ends of the infringing cartons, and the superimposed wax-paper interior, are also uniform points of likeness."

* * * * * * * *
"The facts in the case sub judice, in my judgment, abundantly establish that the defendant's cartons and carton wrappers, its seal, trade mark and trade name, associated as they are, tend towards deceiving and are likely to deceive the purchasing public into the belief that the defendant's crackers and biscuits are those of the complainant."
See also A. Hollander & Son, Inc., v. Jos. Hollander, Inc., 117 N.J. Eq. 306 (Ch. 1934), affirmed 118 N.J. Eq. 262 (E. & A. 1935).
I cannot find from the evidence that the public has been misled by having defendants' article palmed off on it as plaintiff's. The name is sufficiently dissimilar to make purchasers aware of the difference. The bottle is a common stock *73 bottle in ordinary use by a great many sellers of fluids. The color is not especially distinctive.
There is no reason why defendants should not solicit plaintiff's trade. The mere one-time employment of defendants by plaintiff, in and of itself, is not sufficient ground to prevent such course of action.
I find as well that plaintiff has not borne the burden of proving false representations by defendants' agents to its one-time customers.
The complaint will be dismissed.