25 N.J. Super. 591 (1953)
96 A.2d 788
SUN DIAL CORPORATION, A CORPORATION OF NEW JERSEY, PLAINTIFF,
v.
CARL D. RIDEOUT, JAMES L. RIDEOUT, ROBERT A. WHITFIELD, NANCY ORI WHITFIELD AND PRECISION MARKING CO., A CORPORATION OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 17, 1953.
*594 Mr. F.O. Miniutti, and Mr. Ira Milton Jones of the Wisconsin Bar, for the plaintiff (Messrs. Davidson & Miniutti, attorneys).
Mr. Walter D. Van Riper for the defendants (Messrs. Van Riper and Belmont, attorneys).
FREUND, J.S.C.
The plaintiff, Sun Dial Corporation, seeks to restrain the defendants from using an alleged secret process obtained by the defendants while in plaintiff's employ. The defendants deny that the plaintiff's process is secret.
Since the proceeding involved an alleged secret process, the testimony was taken in camera and any discussion of the evidence will be general. Taylor Iron and Steel Co. v. Nichols, 73 N.J. Eq. 684 (E. & A. 1907). Heyden Chemical Corp. v. Burrell, 2 N.J. Super. 467 (Ch. Div. 1949).
In 1943, William J. Williams, Jr. organized the plaintiff corporation, of which he has always been president. He had *595 been employed by Chamborn Corporation and Linotone Corporation, both of which manufactured dials. In brief, the alleged secret process is a method of marking photographically the gradations on precision dials. Williams testified that Sun Dial has three licensees who manufacture dials by the plaintiff's process.
In 1951 the individual defendants, all former employees of the plaintiff, organized the defendant corporation, Precision Marking Co., and began the manufacture of dials in competition with the plaintiff. Many of the defendant's employees were formerly employed by the plaintiff.
Williams testified that from the inception of the plaintiff's business there was a "No Admittance" sign at the entrance of its plant, that every employee was told the process was secret, and accordingly, although there was no express contract, was under a duty not to use or divulge the alleged secret process. This testimony was partially corroborated by other witnesses for the plaintiff, but notwithstanding the fact that over the years an aggregate of 247 persons had been employed by the plaintiff, not one was called to testify that prior to 1949 employees were told the process was secret.
The proofs disclose that in 1949 after the plaintiff moved into its present plant, a sign was posted at the door of the plant, stating "* * * we are working under a secret process," and visitors in order to gain admittance to the plant were required to sign a register at the top of each page of which was the legend: "I, the undersigned, acknowledge that any processing observed on these premises is considered SECRET PROCESS which I agree not to use or divulge." Three of the four individual defendants were employed by the plaintiff prior to 1947. All the defendants testified, firmly corroborated by former employees of the plaintiff, that they never were told the process was secret. Those who had been in the plaintiff's employ in 1949 testified that the sign and the register stating "secret process" were put in use at that time for security reasons because of a government contract, and their testimony in this regard *596 is bolstered by photostats of pages of the register, in evidence, showing on each page a column headed "U.S. Citizen."
Williams testified that the manufacturing processes used by Chamborn and Linotone were not secret. Although he insisted that the Sun Dial process is so different from the Linotone process as to be "secret," there was testimony that basically there is nothing novel in the Sun Dial process. Admittedly, the defendants are using the Sun Dial process, and two employees of Linotone testified that they had inspected the Precision plant shortly before the trial of this matter, and that the Sun Dial process there being used was basically like the Linotone process, which was never secret. The proofs indicate that both processes use photography in the marking of dials. However, the Sun Dial process differs from the Linotone process in the method of coating and relieving the dials, and the solutions and agents used.
In July 1947 a nationally distributed trade magazine, Plastics, carried an article entitled "Photographic Process Speeds Markings." The article was written by Williams in collaboration with an associate editor of the magazine and it referred to the plaintiff corporation by name and purported to describe in detail its manufacturing process. The article does not call the process "secret" and about it Williams testified as follows:
"We said in here at one place, a light-sensitive lacquer. That was an ambiguity. Actually there is no such thing as a light-sensitive lacquer. * * * `A protective lacquer containing a light-sensitive constituent.' There is no such thing as a lacquer containing a light-sensitive constituent. That is one of the things of definite ambiguity I put in here. Since that came out we have had an untold number of letters from all over the country asking us how do we sensitize a lacquer, and then we had to write back and say that was part of our secret process, and we couldn't reveal it. We were speaking of our ambiguity. * * *"
There was admitted in evidence tentative specifications for "Photoengraving Lacquer Coated Lucite Panels" issued by Bendix Radio Corporation in 1948, after publication of the plaintiff's article in Plastics. The vice-president of one of plaintiff's licensees testified that with the information supplied *597 by the specifications and by the magazine article, his corporation tried to produce dials similar to the plaintiff's, but without success. Such failure is understandable in view of the admitted deliberate ambiguity of the magazine article.
The proofs disclose that Williams endeavored to have the Sun Dial process appear "secret." He testified he gave instructions that in showing visitors through the plant, generic terms be used rather than specific. Further, that in one step of the manufacturing process, a common laundry bleach is used; that although purchased locally, in order that the employees would not know what it was, he had it rebottled in unlabelled bottles by an employee, George Mullins, who lived near the plant. Mullins, now an employee of the defendants, categorically denied that he ever did any rebottling. When recalled in rebuttal, Williams dismissed this denial as a "slip of memory," but admitted that through an error it had become known what the liquid was and thereafter no attempt was made to conceal its identity.
It is well settled that one who invents or discovers and keeps secret a process of manufacture, has a property therein which this court will protect against those who, in violation of an express contract or in breach of their confidential relation to their employer, undertake to apply it to their own use. They will be enjoined from using or divulging the secret to the injury of their employer. Salomon v. Hertz, 40 N.J. Eq. 400 (Ch. 1885); Stone v. Grasselli Chemical Co., 65 N.J. Eq. 756 (E. & A. 1903); Club Razor & Blade Mfg. Corp. v. Bindzsus, 131 N.J. Eq. 283 (Ch. 1942), affirmed 133 N.J. Eq. 38 (E. & A. 1943); Flexmir, Inc. v. Herman, 138 N.J. Eq. 594 (Ch. 1946). However, it is elementary that before there can be a breach of confidence by an employee, there must in fact be a "secret process," a "trade secret" owned and used by the employer. Boost Co. v. Faunce, 13 N.J. Super. 63 (Ch. Div. 1951), affirmed 17 N.J. Super. 458 (App. Div. 1952); 43 C.J.S., Injunctions, § 148; 5 Williston on Contracts (rev. ed.), § 1646.
A trade secret is not mere knowledge or the efficiency of experience. It is not mere skill in manipulation. Stone *598 v. Grasselli Chemical Co., supra; Inboden v. L.W. Hawker, Inc., 41 N.E.2d 271 (Ct. App. Ohio 1941). A trade secret may consist of formulae, patterns, machines or processes of manufacturing for continuous use in the operation of a business. Mycalex Corp. v. Pemco Corp., 64 F. Supp. 420 (U.S.D.C. Md. 1946). 79 C.J.S., Secret, page 936; 4 Restatement, Torts, § 757. While the secret may consist of what ingredients are used, in what proportion or the method of combining, the origination of the process must have employed such creative faculties as to amount to a meritorious discovery. Boost v. Faunce, supra; 43 C.J.S., Injunctions, § 148. Additionally, a substantial element of secrecy must exist so that only by virtue of improper means or a confidential relationship could the information be acquired. The secrecy need not be inherent in discovery, but may be a qualified secrecy arising through mutual understanding, required by good faith and good morals, and imposing a duty not to use or divulge the secret to the detriment of the owner. Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387, 396 (E. & A. 1906). Carver v. Harr, 132 N.J. Eq. 207 (Ch. 1942). The degree of secrecy cannot be exactly measured. However, several factors may be used as gauges, among them the following here relevant: the extent to which the information is known both by employees and by outsiders, and the measures taken to guard the information. 4 Restatement, Torts, § 757. 79 C.J.S., Secret, page 936.
In weighing these factors, it should be remembered that the knowledge and skill which is obtained through experience is not a trade secret, that sound public policy favors employees bettering themselves, and that employees may carry away and use the skill acquired during the course of an employment either in business for themselves or in the service of other employers. The employer must present a very strong case in order to secure relief by injunction; if his was the secret, his was the burden of guarding it and his is now the burden of proving that it was in fact a "trade secret." Haut v. Rossbach, 128 N.J. Eq. 77 (Ch. 1940), *599 affirmed 128 N.J. Eq. 478 (E. & A. 1940); Boost Co. v. Faunce, supra.
In considering the extent to which the secret was known to employees, the evidence reveals that the process was known to all employees of the plaintiff who had either need or opportunity to be informed. There was testimony that the employees were not restricted to certain locations in the plant; they were generally free to move about. Nor was the formula for the light-sensitive solution kept under lock and key; it was posted on a door in the coating room and any employee could open the door and read the formula.
The plaintiff admits that many outsiders have visited the Sun Dial plant and observed its process. From the beginning of the business in 1943 until the register was put in use in 1949, no record of visitors was kept and it is impossible to estimate how many outsiders went through the plant during that time. However, the register pages for the three years from February 15, 1949 to February 14, 1952 show approximately 500 visits to the plant  not by 500 different visitors, but there were at least 500 separate entries.
When the measures taken to guard the secret are considered, the proofs are sharply at variance. Williams testified, uncorroborated by anyone who had been employed by the plaintiff prior to 1949, that the employees were on notice that the process was secret and were under instruction to so advise any visitors to the plant. The defendants emphatically denied this testimony, strongly supported by witnesses who had been plaintiff's employees prior to 1949 and thus in a position to know of their own knowledge whether or not such conditions existed.
Conceding, arguendo, that the process as described in the article in Plastics magazine did not accurately describe the plaintiff's process in detail and that the difference between the methods as used and as described may have constituted a trade secret, Flexmir Inc. v. Herman, supra, the fact that the disclosure was only approximate will not, without more, be a ground for holding more precise information secret. Mycalex Corp. v. Pemco Corp., supra. The plaintiff cannot *600 render a process "secret" merely by calling it so  it must in fact be "secret." The circumstances surrounding the business and the way it has been carried on from the inception of the secret process must bear the indicia of secrecy. Here, it does not appear that the plaintiff's course of conduct indicated a "secret process." The testimony that employees were told the process was "secret" was so strongly overcome by the weight of the defendants' evidence as to be definitely refuted.
As to the measures in use since 1949, viz., the "secret process" sign and the visitors' register, it is admitted that the Sun Dial process is today essentially the same as in the beginning. Accordingly, a process which from 1943 to 1949 was not secret cannot be rendered secret by the tardy imposition of security measures. Either it was from the beginning a secret process or it was not. The plaintiff cannot prove the existence of a trade secret by mere assertion or deliberate ambiguity  especially when the testimony of its principal witness is unsupported by employees upon whom it should have relied.
Although emphasis is not put upon the point, the plaintiff looks to its licensing arrangements as corroborating a "secret process." While their existence has some probative value, it is not sufficient to overcome the preponderance of the evidence, for the licensees may have preferred to enter into such arrangements rather than spend the time and money necessary to acquire sufficient experience to successfully duplicate plaintiff's dials.
Further, a confidential relationship cannot be imposed without notice that the information is imparted in confidence  it cannot arise without consent. If, in fact, the plaintiff's employees were not cautioned that the process was secret and should not be used or divulged, there arose no relationship, the violation of which would constitute a breach of confidence for which the defendants would be liable. 56 C.J.S., Master and Servant, § 72.
The complaint will be dismissed.