**DARSYN LABORATORIES, Inc.**

v.

**LENOX LABORATORIES, Inc. et al.**

Civ. No. 23–50.

United States District Court D. New Jersey.

March 26, 1954.

Evans, Hand & Evans, Paterson, N. J., by H. C. Bierman, New York City, for plaintiff.

Jerome J. Heyman, Plainfield, N. J., for defendants Lenox Labs., Inc., Benjamin Pecherer, and William Gerlach.

Adams, Forward & McLean, New York City, by Roger T. McLean, New York City, for defendants Gamma

**44**

Chemical Corp., J. Robert Fisher and John Robson.

Max Mehler, Newark, N. J., for defendant Irving Biber.

SMITH, District Judge.

This is a civil action under the patent laws, and the jurisdiction of the Court is founded solely on Section 1338 of Title 28 U.S.C., 28 U.S.C.A. § 1338. The complaint is in one count but states two separate and distinct claims: first, a claim against the defendants Gamma Chemical Corporation, hereinafter identified as "Gamma," John Robson, and J. Robert Fisher, for the infringement of a patent of which the plaintiff is admittedly the owner; and second, a claim against all of the defendants for the misappropriation of certain trade secrets and unfair competition. These claims are predicated upon separate and distinct causes of action and must, therefore, be separately considered.

### Relationship of the Parties

The plaintiff, a corporation of New Jersey, was organized in March of 1946, and thereafter was engaged in the manufacture of hydroxyquinoline. The defendant Biber was an officer of this corporation until December 2, 1946, when he resigned after selling his stock to the Metalsalts Corporation. Thereafter the defendant Biber organized the Lenox Laboratories, a corporation of New Jersey, which was engaged in the manufacture of hydroxyquinoline until October 17, 1949, or shortly thereafter, when, pursuant to an agreement, it sold its assets, including machinery, equipment and processes, to the defendants Robson, Fisher and Zempliner, who thereafter assigned and transferred these assets to Gamma, a corporation of New Jersey.

### Claim for Infringement

The patent in suit pertains generally to the manufacture of 8-hydroxyquinoline, hereinafter identified as "hydroxyquinoline," and relates particularly to the alkali hydrolysis of quinoline-8-sulfonic acid, or its alkali metal salt, from which the hydroxyquinoline is synthesized and isolated. The claims of the patent in suit, construed in the light of the specifications, relate to an improvement on the earlier process of *Alkali Hydrolysis*, which was concededly old, and are limited to the successive steps therein defined.

The raw material from which hydroxyquinoline is ultimately synthesized is quinoline, a coal tar derivative, synthesized and isolated by the Skraup process, commonly called Skraup's synthesis. Quinoline is a benzo-pyridine, a heterocyclic base, having two dissimilar rings—the benzene and pyridine nuclei—with two ortho-carbon atoms common to both. The hydrogen atoms occupy dissimilar positions relative to the nitrogen atom, and consequently seven mono-substitution products and twenty one di-substitution products, one of which is hydroxyquinoline, are possible for similar substituents. The quinoline compounds have their substituents in the benzene nucleus.

The quinolines possess known chemical properties common to the aromatic hydrocarbons. These properties are ascribable primarily to the presence of the benzene nucleus. The quinolines, like the aromatic hydrocarbons, yield a sulfonic acid upon sulfonation, to wit, the treatment of the quinoline with oleum (sulphuric acid containing approximately 20% of sulphur trioxide, $SO_3$, in solution) at a temperature within the range of 90°C. to 160°C.; an increase in temperature, but within the range, is known to expedite the reaction. The quinoline-8-sulfonic acid thus produced, like the sulfonic acids of the aromatic hydrocarbons, yields the sodium salt upon alkali hydrolysis, to wit, fusion of the sulfonic acid with caustic soda at fusion temperature. These known chemical properties are utilized not only in the manufacture of hydroxyquinoline but also in the manufacture of many derivatives of the aromatic hydrocarbons.

The sulfonation process is one of known utility in the chemical industry, particularly in the synthesis, isolation

and manufacture of the derivatives of the aromatic hydrocarbons. It is employed in the manufacture of quinoline-8-sulfonic acid, the raw material from which the sodium salt of hydroxyquinoline is synthesized. It is also employed in the manufacture of sulfonic acids of benzene and naphthalene, the raw materials from which their compounds are synthesized. See "Unit Processes in Organic Synthesis," pages 209 to 271, inclusive, published in 1935 and 1938, "Sulfonation," by Groggins and Simpson. The sulfonation of the aromatic hydrocarbons and the aromatic amines is a separate and distinct process, and is so regarded in the chemical industry. It is generally employed in the manufacture of the intermediate products from which the many derivatives of the aromatic hydrocarbons are synthesized. Ibid.

The claims of the patent in suit are expressly limited to the alkali hydrolysis of quinoline-8-sulfonic acid and its alkali metal salts; in fact, there is no reference in the patent to the sulfonation process. The patentees apparently regarded sulfonation and hydrolysis as separate and distinct processes. The plaintiff here claims an improved process for the sulfonation of quinoline as a trade secret, and an improved process for the hydrolysis of quinoline-8-sulfonic acid as a patentable invention. We purposely refrain from any discussion of the sulfonation process for reasons which are hereinafter discussed.

### Prior Art

It was common knowledge long prior to the present invention that quinoline-8-sulfonic acid, or its alkali metal salt, could be converted into the sodium salt of 8-hydroxyquinoline by alkali hydrolysis, to wit, the fusion of quinoline-8-sulfonic acid with caustic soda or potash. This was disclosed by Fischer in a patent (No. 270,045), issued in 1883, and in two earlier articles to which reference is hereinafter made. It was also common knowledge that the process was of particular utility in the hydrolysis of the sulfonic acids of the aromatic hydrocarbons. See "Unit Processes in Organic Synthesis," pages 537 to 574, inclusive, published in 1935 and 1938, "Hydrolysis," by Lloyd.

The process of the Fischer patent is therein described as follows: "In carrying out my invention *one part,* by weight, of quinoline-sulfonic acid is carefully heated in an iron-melting-pan on an open fire with from one to *two parts,* by weight, of caustic soda or two or three parts, by weight, of caustic potash. The heating is continued until a sample of the *molten mass* on being neutralized with hydrochloric acid no longer gives a separation of unchanged quinolinesulfonic acid. When this point has been reached the molten mass is *dissolved in water and completely neutralized by hydrochloric acid.* The oxyquinoline is then distilled off by a strong current of steam." (Emphasis by the Court.) It is conceded that the *molten mass* is maintained at a temperature above 310°C. during the reaction.

The process was discussed in two articles (D–G8), published by Bedall and Fischer on March 3 and June 16, 1881. The process defined in the cited patent is more fully explained in the later article, from which we quote: "Concerning the production of hydroxyquinoline the following is to be additionally observed. The quinolinesulfonic acid in powder is, by gradual addition to a *two* or three fold volume of caustic soda to which a one-quarter part of its weight of water was added, carefully brought to melting point over an open flame, with frequent stirring. After some time the mass (becomes) greenish yellow, and later the smell of quinoline appears. At this moment the *melting must be interrupted,* as otherwise (considerably more) decomposition takes place. To isolate the formed hydroxyquinoline, the *molten mass* is dissolved in hydrochloric acid, and the weak acid solution is at once mixed with sodium carbonate and then a strong steam jet is admitted. The hydroxyquinoline is thereby easily volatilized with the steam and condenses in

the receiver into beautiful colorless needles." (Emphasis by the Court.)

It will be observed that in the specific process described in the cited patent the hydroxyquinoline is isolated and recovered by the following method: When the reaction is complete the molten mass, which is still at reaction temperature, is dissolved in water to which there is added only sufficient acid, either hydrochloric or sulphuric, to neutralize the solution; the neutralization of the solution isolates the hydroxyquinoline from the sodium salt, the reaction product, and is recovered by distillation. This conclusion is supported not only by the specifications of the cited patent, but also by the article of March 3, 1881, supra.

The article of June 16, 1881 discloses a modified method which may be employed to isolate and recover the hydroxyquinoline. This method comprises the following successive steps: first, the molten mass, which is still at reaction temperature, is dissolved in water to which there is added sufficient acid, either hydrochloric or sulphuric, to insure complete solution of the sodium salt of the hydroxyquinoline, the reaction product; second, the weak acid solution is neutralized by the addition of sodium carbonate, and the hydroxyquinoline is thus isolated from the sodium salt; and third, the hydroxyquinoline is recovered by distillation.

The successive and concomitant steps of the Fischer process, as described in the articles, may be summarized as follows: (a) The fusion kettle is charged with predetermined quantities of sodium hydroxide and quinoline-8-sulfonic acid, preferably two parts of the former to one of the latter; the quinoline-8-sulfonic acid is introduced gradually as the charge is stirred or agitated. (b) Concomitant with the introduction of the quinoline-8-sulfonic acid the mixture is carefully heated until it is a molten mass, approximately 315°C. to 327°C., the reaction temperature; the application of external heat is discontinued when the molten mass gives evidence of decomposition. (c) When the reaction is complete the molten mass is dissolved in a quantity of water to which there is added sufficient acid, either hydrochloric or sulphuric, to insure solution. (d) The weak acid solution of the sodium salt of hydroxyquinoline is then neutralized by the addition of sodium carbonate and the hydroxyquinoline is thus isolated. (f) The hydroxyquinoline is recovered by distillation.

It should be noted that the Fischer patent does not recommend the *addition* of water; there is approximately one-half of one per cent of water present in the sodium hydroxide. The article of June 16, 1881, recommends the *addition* of water. The addition of water would, therefore, seem to be optional, according to the teachings of Fischer. It was known prior to the patent in suit that the alkali hydrolysis of the sulfonic acids could be effected at high temperature "with little or no water." See "Unit Processes in Organic Synthesis," supra, "Hydrolysis," supra.

A process for the synthesis and isolation of phenol from benzenesulfonic acid, or its alkali metal salt, is disclosed in an article entitled "Hydrolysis," by Stewart J. Lloyd, which appears in "Unit Processes in Organic Synthesis, published in 1938. The process therein described is directed particularly to the synthesis by alkali hydrolysis of sodium phenolate, the reaction product from which the phenol is isolated and recovered.

The teachings of this reference are particularly pertinent and may be summarized as follows: The sodium phenolate, the reaction product from which the phenol is isolated and recovered, is produced by the fusion of sodium benzenesulfonate and caustic soda to which there is added approximately 2 %, by weight, of water; the benzenesulfonate, as the name indicates, is a product of the sulfonation process. The fusion kettle is charged with a predetermined quantity of caustic soda, which is then heated to reaction temperature, 300° to 320°C., "at which time the solution of benzenesulfonate is pumped, in a regulated manner,

under the surface of the caustic melt." When the reaction is complete the molten mass is quenched in a "measured quantity of sodium phenolate wash waters from previous charges." The phenol is released and isolated from the aqueous suspension of sodium phenolate upon neutralization in the manner described in the article. It should be noted that in this process a *small quantity of water* is added to the caustic soda, a common practice in alkali hydrolysis.

We perceive in the successive steps of the fusion process of Lloyd a rather obvious modification and adaptation of the successive steps of the fusion process of Fischer hereinabove described. It will be observed, however, that in the Lloyd process the *caustic soda is heated to the reaction temperature* before the sodium benzenesulfonate is introduced. However, in both processes the *molten mass* is maintained at reaction temperature until the reaction is complete. The reaction temperature in both processes, Lloyd and Fischer, is above the fusion point.

There is disclosed in the same article a process for the synthesis and isolation of naphthol from naphthalenesulfonic acid. The successive steps of the process are the same as those hereinabove described. The sodium naphtholate is produced by the fusion of caustic soda and sodium naphthalenesulfonate at a temperature of approximately 300°C. When the reaction is complete the molten mass is dissolved in the "weak washings" from the previous crude washings. "The resulting *hot solution* is filtered through iron filter presses, the filtrate going into the acidification tanks, * * *." (Emphasis by the Court.) The naphthol is isolated by the acidification of the filtrate, which, during this step of the process, is maintained at a temperature of 93°C. It should be noted that in this process a substantial quantity of water is present in the sodium naphthalenesulfonate.

The relevancy of the disclosures of the cited reference, "Hydrolysis," supra, should be apparent to the persons skilled in the art to which the patent in suit pertains, to wit, the alkali hydrolysis of the sulfonic acids and their alkali metal salts. Benzene, naphthalene and quinoline are known to possess chemical properties common to the aromatic hydrocarbons; these properties in quinoline are ascribable to the benzene nucleus in which the quinoline compounds have their substituents. Their chemical reactions upon alkali hydrolysis are known and predictable. The cited reference clearly indicates that the Fischer process, modified and adapted to commercial production, may be employed in the manufacture of phenol and naphthol, which, like hydroxyquinoline, are the ultimate products of alkali hydrolysis.

It should be observed that in each of the processes hereinabove described the temperature is maintained at 300°C. or more during the reaction, and the reaction occurs while the constituents are in a *molten state*. It is conceded that this was the recognized practice in the industry prior to the patent in suit.

### File Wrapper

The patent in suit contains fourteen claims, each of which is the amended counterpart of a claim contained in the original application. The original claims were rejected "as lacking invention over each of the references cited," to wit, the patent to Fischer, and the articles by Bedall and Fischer, supra. The claims were then amended to overcome the objection interposed by the examiner.

We direct our attention to Claim 9 of the original application. The invention is therein defined as follows: "A method of making 8-hydroxyquinoline which comprises providing divided sodium hydroxide, adding thereto less than 4% of water, heating said mixture to a temperature of at least 250°C., introducing quinoline-8-sulfonic acid or its alkali or alkaline earth metal salts into said mixture, and agitating the same, maintaining the reaction temperature for from 5 to 30 minutes, whereby the sodium salt of 8-hydroxyquinoline is

48

formed." The other claims, although not identical, were similar.

The patentees, in response to the rejection and in support of their claims, filed a reply in which they stated:

"The U. S. patent to Fischer, which the Examiner has cited, shows a reaction in which *no water* is present and the composition is heated so that it becomes a molten mass.

"Applicants' operating conditions are quite different. First, there is *no fusion of the mass;* second, the caustic soda is finely divided, and third, there is present a very small amount of water which is a small fraction of that present in the prior process but is quite necessary to applicants' (sic.) operation.

"Applicants' claims are directed to these three features and also to the *temperatures used,* which are below the fusion point of caustic soda, the temperatures ranging between 250°C. and 290°C. *All the conditions* as set forth in the claims *are necessary* in order to obtain the successful result which applicants' process affords." (Emphasis by the Court.)

There was filed in the proceedings an affidavit by Nathaniel Grier, one of the patentees. He stated therein: "Further, Fischer in the patent cited states 'the *heating* is *continued* until a sample of the *molten mass* on being neutralized with hydrochloric acid no longer gives a separation of quinoline-8-sulfonic acid.' (Italics ours.) Experimental evidence indicates that for the fulfilment of these conditions outlined by Fischer temperatures of at least 320°C. are needed. *Applicants have set 290°C. as the upper limit for the reaction,* and under the stated conditions the *complete reaction mixture does not melt.* The final reaction mixture within the temperature limits set by us is in the form of a *dry powdery mass.* It is not a melt in any sense. The reaction product is unsintered. No melting can take place at 290°C. or lower. *This is of fundamental importance* and greatly affects the yield of 8-hydroxyquinoline. It is

detrimental to the yield to cause a melting of the complete reaction mixture especially towards the end of the reaction. The small amount of water added and *that which results as the conversion progresses* serve as a temporary medium for the reaction to occur at the temperatures used by the applicants." (Emphasis by the Court.)

Patent in Suit

The plaintiff here relies on claims 1, 2, 9, 11 and 14. Claims 9 and 14 are typical. The former defines the invention as follows: "A method which comprises providing divided sodium hydroxide, adding thereto 0.5 to 4% of water, heating said mixture to a temperature of 250°C. to 290°C., introducing a compound taken from the group consisting of quinoline-8-sulfonic acid and its alkali and alkaline earth metal salts into said mixture, the ratio of sodium hydroxide to said sulfonic acid being 1.2–2 to 1, and agitating the same, maintaining the reaction temperature for from 5 to 30 minutes, whereby the sodium salt of 8-hydroxyquinoline is formed." The latter includes an additional step, to wit, "dissolving the reaction product *while at reaction temperature* in water, whereby said sodium salt is freed from the excess of sodium hydroxide." (Emphasis by the Court.) These claims must be narrowly construed for the reasons hereinafter discussed.

The specification of the patent in suit states that the object "of the present invention is to provide a process wherein the *reaction takes place in the semi-solid phase without fusion of the constituents.*" The specification further states: "The temperatures used range from 250°C. up to about 290°C. The reaction starts slowly at about 250°C. and reaches a *maximum* at about 290°C. If lower temperatures are used, the reaction is so slow as to practically not take place, *while* if the temperature is raised to substantially *above* 290°C., the yield * * * is reduced to a substantial extent depending on the temperature used." (Emphasis by the Court.) This

explanation is consistent with the explanation contained in the affidavit, supra. We must, therefore, presume that the temperature limits are critical in the practice of the invention.

It is urged by the plaintiff, as it was in the prosecution of the patent application, that the invention is a specific improvement on the invention covered by the patent to Fischer, supra. The only improvement, however, appears to be in the allegedly *novel concept of maintaining the temperature of reaction* within the limits of 250°C. to 290°C. The proportion of sodium hydroxide to quinoline-8-sulfonic acid is clearly within the range prescribed by Fischer not only in his patent but also in the early articles. The final step described in claim 14, to wit, "dissolving the reaction product while at reaction temperature in water" is likewise disclosed by Fischer. This step is disclosed also by Lloyd in his article entitled "Hydrolysis," supra.

When the claims in suit are construed in the light of the prior art and the specifications of the patent, as they must be, it is evident that the essence of the invention lies primarily, if not solely, in the *novel concept of maintaining the reaction temperature within the defined limits,* which are concededly below the fusion point of the constituents. This feature was urged as pivotal in the prosecution of the patent application and in support of the claim to patentable invention; in fact, the patentees stated in unequivocal language that this concept distinguished their process from the earlier process of Fischer.

There is an additional factor which must be taken into consideration in our construction of the claims in suit. The file wrapper reveals that the patentees acquiesced in the rejection of the original claims, and, in response to the objections of the examiner, incorporated a specific temperature range, supra, in each of the fourteen claims. It is well established that where "an applicant for a patent acquiesces in the rejection of claims, and amends the claims * * * to meet the objection of the Patent Office, he will be deemed to have surrendered and disclaimed what he thus conceded and is bound by the limitations imposed, and it is immaterial whether the rejection was right or wrong." Texas Co. v. Anderson-Prichard Refining Corporation, 10 Cir., 122 F.2d 829, 842; I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 443, 47 S.Ct. 136, 71 L.Ed. 335; Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220, 312 U.S. 654, 61 S.Ct. 235, 239, 85 L.Ed. 132, et seq.; Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736. This rule is applicable where, as here, the claims in suit cover the successive and concomitant steps of an *improved process which is distinguishable from the process of the prior art only in the limitations adopted and incorporated in the claims.*

It should be emphasized that the claims of the patent in suit cover and are expressly limited to a process for the manufacture of the sodium salt of 8-hydroxyquinoline, from which the hydroxyquinoline is isolated and recovered. The sodium salt, formed by the reaction, is dissolved in water when the reaction is complete; the hydroxyquinoline is isolated upon neutralization of the solution and is thereafter recovered by distillation.

The specifications of the patent disclose alternative expedients for the isolation and recovery of the hydroxyquinoline, but these expedients are not claimed as elements of the invention. These expedients are obvious modifications of the method disclosed by Fischer and Bedall, supra. It must therefore be presumed that these expedients were either old—and the specifications of the patent would indicate that they were— or abandoned.

The claims of the patent as issued are the measure of the grant and the patentee's monopoly. "Nothing is better settled in the law of patents than that the patentee may claim the whole or only a part of his invention, and that,

if he only describe and claim a part, he is presumed to have abandoned the residue to the public. The object of the patent law in requiring the patentee to 'particularly point out and distinctly claim the part, improvement or combination which he claims as his invention or discovery' is not only to secure to him all to which he is entitled, but to apprise the public of what is still open to them. The claim is the measure of his right to relief, and, while the specification may be referred to to limit the claim, it can never be made available to expand it." McClain v. Ortmayer, 141 U.S. 419, 423, 424, 12 S.Ct. 76, 77, 35 L.Ed. 800. See also Miller v. Bridgeport Brass Co., 104 U.S. 350, 352, 26 L.Ed. 783; Royal Co. v. Tweedie, 8 Cir., 276 F. 351, 355; Rip Van Winkle Wall Bed Co. v. Murphy Wall Bed Co., 9 Cir., 1 F.2d 673, 679; Ely Norris Safe Co. v. Mosler Safe Co., 2 Cir., 62 F.2d 524, 526. The doctrine is clearly applicable here.

The successive and concomitant steps of the patented process may be summarized and described as follows: (a) The fusion kettle is charged with a predetermined quantity of caustic soda, 335 parts, by weight, to which there is added 8.4 parts, by weight, of water; the mixture is heated to a temperature of 270°C., which is within the critical range defined by each of the claims in suit. (b) Thereafter a predetermined quantity of quinoline-8-sulfonic acid, 210 parts, by weight, is introduced into the fusion kettle while the constituents are stirred or agitated; the "semi-solid" mixture is stirred or agitated until the reaction is complete, approximately 5 to 30 minutes. (c) When the reaction is complete the "semi-solid" mixture, while still hot, is dissolved in a quantity of water to which there is added a sufficient quantity of sulphuric acid to insure solution. (d) The solution is neutralized by the addition of sodium hydroxide. (e) The hydroxyquinoline, which is isolated from the sodium salt of hydroxyquinoline upon neutralization of the solution, may be recovered by distillation. The reaction temperature is maintained within the range defined by the claims, to wit, 250°C. to 290°C.

This summary follows substantially the example described in the specification of the patent. It should be observed, however, that only steps (a), (b), and (c) are defined in the claims in suit; steps (d) and (e), although disclosed in the specification, are not claimed as elements of the invention. The specification would indicate that expedients (d) and (e) were well known; the specification states that the reaction product, the sodium salt of hydroxyquinoline, "may be treated in any well known manner to recover the pure 8-hydroxyquinoline." We might add that in the practice of the Fischer process the hydroxyquinoline may be isolated and recovered from the sodium salt of hydroxyquinoline in substantially the same manner.

### Infringement

The issue of infringement here turns on the construction to be given the claims in suit, which are limited, as we have heretofore construed them, to a specific combination of successive and concomitant steps. The charge of infringement can be sustained only upon proof that the accused process embraces, in similar combination, the successive and concomitant steps of the patented process, and particularly those steps regarded as critical in the practice of the invention. Royer v. Coupe, 146 U.S. 524, 530, 13 S.Ct. 166, 168, 169, 36 L.Ed. 1073, et seq.; Universal Oil Products Co. v. Globe Oil & Refining Co., 7 Cir., 137 F.2d 3, 8, affirmed 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399; United States Glass Co. v. Atlas Glass Co., 3 Cir., 90 F. 724; Jensen-Salsbery Laboratories v. O. M. Franklin Blackleg Serum Co., 10 Cir., 72 F.2d 15, 18, et seq.; John Waldron Corporation v. Equitable Paper Bag Co., 3 Cir., 106 F.2d 724; Haynes Stellite Co. v. Osage Metal Co., 10 Cir., 110 F.2d 11; Texas Co. v. Anderson-Prichard Refining Corporation, 10 Cir., 122 F.2d 829, 841; United States Rubber Co. v. General Tire & Rubber Co., 6 Cir., 128 F.2d 104, 108,

et seq. It is well settled that a substantial departure from the process of the patent negatives the charge of infringement. Ibid.

We are fully aware that the charge of infringement may not be avoided by the omission of an essential element of the invention, where such omission is coupled with the substitution of an equivalent element. This rule, however, must be limited in its application, where, as here, the patentee has narrowed his claim to escape the rejection of his application. Weber Electric Co. v. E. H. Freeman Electric Co., 256 U.S. 668, 677, 41 S.Ct. 600, 65 L.Ed. 1162; I. T. S. Rubber Co. v. Essex Rubber Co., supra; Smith v. Magic City Kennel Club, 282 U.S. 784, 790, 51 S.Ct. 291, 294, 75 L.Ed. 707. Where "a patentee has narrowed his claim, in order to escape rejection, he may not 'by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments, which amount to disclaimer.'" Smith v. Magic City Kennel Club, supra.

The rule, which must be applied under such circumstances, is succinctly stated in Smith v. Magic City Kennel Club, supra, as follows: "The applicant having limited his claim by amendment and accepted a patent, brings himself within the rules that if the claim to a combination be restricted. to specified elements, all must be regarded as material, and that limitations imposed by the inventor, *especially such as were introduced into an application after it had been persistently rejected*, must be strictly construed against the inventor and looked upon as disclaimers. (Citations omitted.) The patentee is thereafter estopped to claim the benefit of his rejected claim or such a construction of his amended claim as would be equivalent thereto." (Emphasis by the Court.)

We must be guided by these principles in our determination of the issue of infringement.

The defendant Gamma admitted that it is engaged in the manufacture of hydroxyquinoline but denied the charge of infringement. This defendant offered no testimony in support of its denial, but rested its defense solely on the testimony offered by the plaintiff. This testimony not only failed to prove the charge of infringement but in fact disproved it.

The accused process was fully described by two private investigators, who, on the instructions of the plaintiff, covertly obtained employment in the plant of the defendant Gamma. The evidence which they gathered during their employment was thereafter made available to one Dr. George Barsky, a chemical engineer, who made a careful study of the process. The investigators and Dr. Barsky testified in the trial of this action.

The successive and concomitant steps of the accused process may be summarized and described as follows: (a) The fusion kettle is charged with a predetermined quantity of caustic soda, four hundred pounds, which is then heated to a temperature of approximately 320°C.; when the caustic soda is *molten* the application of external heat is discontinued. (b) Thereafter a predetermined quantity of quinoline-8-sulfonic acid, two hundred pounds, to which fifty pounds of sodium sulphate has been previously added, is introduced into the fusion kettle while the constituents are stirred or agitated; the molten mass is stirred or agitated until the reaction is complete, approximately 15 to 20 minutes. (c) When the reaction is complete the molten mass is dissolved in a quantity of water to which there is added sufficient sulphuric acid to insure solution. (d) The mixture is then cooled and filtered. (e) The filtrate is thereafter heated to a temperature of approximately 75°C. and neutralized by the addition of a suitable alkali, sodium carbonate or sodium hydroxide. (f) The hydroxyquinoline, which is isolated from the sodium salt of hydroxyquinoline upon neutralization of the filtrate, is recovered by distillation. The reaction temperature is maintained within the known limits.

employed in the process of the prior art, to wit, 317°C. to 321°C.

It should be observed that in step (b) of the accused process sodium sulphate is added to the quinoline-8-sulfonic acid *before* its introduction into the fusion kettle. The sodium sulphate functions solely as a *temperature moderator* which absorbs the heat generated by the exothermic reaction; it does not, however, decrease the temperature of the reaction. The temperature of reaction is maintained within the limits of 317°C. to 321°C. notwithstanding the addition of the sodium sulphate. This conclusion is supported not only by the testimony of the investigators but also by the unequivocal testimony of Dr. Barsky, the chemical engineer called as a witness by the plaintiff.

The accused process, upon cursory examination, would appear to infringe the process of the patent in suit, but this is not the fact. The similarity is clearly confined to those steps which are common to both the process of the patent and the process of the prior art; these steps are embodied also in the accused process. The accused process and the process of the patent are otherwise dissimilar; the former does not embrace two critical features of the latter, to wit, the maintenance of the reaction temperature within the limits defined by the claims in suit and the promotion of the reaction while the constituents are in a "semi-solid," as distinguished from a "molten," state. These conditions are described in the specification as pivotal and were urged by the patentees in support of their claim to patentable invention. It was these features which, according to the affidavit of Grier, supra, distinguished the process of the patent from the process of Fischer.

The plaintiff, relying on the doctrine of equivalents, argues that the introduction of the sodium sulphate, in the manner employed by the defendant, effectively reduces the temperature of the fusion mass so that at the time of reaction the temperature is within the range defined by the claims in suit. The argument is refuted by the testimony.

The investigators testified: first, that the charge of caustic soda was heated to a temperature of approximately 315°C., and that thereafter the mixture of quinoline-8-sulfonic acid and sodium sulphate was introduced; second, that during the reaction the mixture in the fusion kettle was a molten mass of the "consistency of mud"; and third, that the reaction was "violent." Any doubt as to the reaction temperature of the fusion mass is dispelled by the unequivocal testimony of Dr. Barsky.

The accused process was duplicated on a commercial scale in the plant of the plaintiff and under the supervision of Dr. Barsky. His testimony at the trial was based on his observations. He testified: first, that the temperature of the caustic soda was at 318°C. immediately before the introduction of the mixture of quinoline-8-sulfonic acid and sodium sulphate; second, that upon the introduction of the said mixture the temperature fell to 317°C., but within several minutes rose to 321°C.; third, that the reaction temperature was within the range of 317°C. to 321°C.; fourth, that during the reaction the mixture in the fusion kettle "boiled;" and, fifth, that the reaction was "violent" and that the commercial operation was consequently hazardous. He further testified that the accused process was not as efficient as the patented process.

We are convinced that under these circumstances it cannot be seriously urged that the function of the sodium sulphate in the accused process is to maintain the reaction temperature within the limits defined by the claims in suit. It clearly appears from the testimony of Dr. Barsky that the introduction of the sodium sulphate, in the manner employed by the defendant, did not appreciably affect the reaction temperature. It further appears from his testimony that the fusion mass remained in a "molten" state notwithstanding the introduction of the sodium sulphate. The sodium sulphate obviously performed the *usual function*

*of a temperature moderator,* the utility of which is generally known in the chemical industry. The introduction of the *sodium sulphate* did not, as the plaintiff here contends, reduce the temperature of reaction.

■■ We are convinced by the testimony here offered by the plaintiff that the accused process does not embrace either the pivotal features of the patented process or their equivalents. The teachings of the patent in suit are, in fact, violated in the practice of the accused process. Therefore, the accused process cannot be held to infringe. Universal Oil Products Co. v. Globe Oil & Refining Co., supra; Wabash Corp. v. Ross Electric Corp., 2 Cir., 187 F.2d 577, 583, et seq., and the other cases hereinabove cited. Where, as here, the accused process does not embrace those steps which distinguish the patented process from the process of the prior art, the accused process does not infringe. Ibid.

The accused process must be appraised also in the light of the prior art, especially where, as here, the claims of the patent are expressly limited to an improvement on an earlier process. When thus appraised the accused process cannot be held to infringe if its essential elements conform substantially to the elements disclosed by the prior art. Stafford v. Albers Bros. Milling Co., 9 Cir., 263 F. 86; Wabash Corp. v. Ross Electric Corp., supra; see also Galion Iron Works & Mfg. Co. v. Beckwith Machinery Co., 3 Cir., 105 F.2d 941, 942; Dixie-Vortex Co. v. Paper Container Mfg. Co., 7 Cir., 130 F.2d 569, 577; Stewart-Warner Corp. v. Lone Star Gas Co., 5 Cir., 195 F.2d 645, 649. The rule is particularly applicable where, as here, the patentee, in response to the objection of the Examiner and to avoid anticipation, adopted and incorporated in his claims limitations not embraced in the accused process.

The successive and concomitant steps of the accused process conform substantially to the successive and concomitant steps of the process disclosed in the prior art: The proportion of caustic soda to quinoline-8-sulfonic acid is within the range disclosed by Fischer; the constituents are maintained in a molten state during the reaction; the reaction temperature is maintained within the range of 317°C. to 321°C., the reaction temperature of the Fischer process; and, the molten mass is dissolved in water to which there is added sufficient mineral acid to insure solution. The only modification is in an operational step, to wit, the introduction of the quinoline-8-sulfonic acid *after* the caustic soda is heated to the approximate reaction temperature of 320°C.; this modification was disclosed by Lloyd in his article on "Hydrolysis," supra. It seems obvious that except for this modification the accused process and the Fischer process are identical. The claims in suit are therefore not infringed.

### Unfair Competition

The plaintiff asserts a claim of unfair competition against the defendant Gamma and its officers, Robson and Fischer. The parties are citizens of New Jersey, and therefore the jurisdiction of the Court rests solely on Section 1338(b) of Title 28 U.S.C., 28 U.S.C.A. § 1338(b). This section vests in the Court "original jurisdiction of any civil action asserting *a claim of unfair competition* when joined with a *substantial and related claim* under the * * *, patent * * laws." (Emphasis by the Court.) The claim must therefore be examined in the light of this provision which is determinative of the jurisdiction of the Court.

The claim of unfair competition is predicated on the charge that these defendants illegally acquired and converted to their own use certain trade secrets of the plaintiff, to wit, an improved sulfonation process which is not covered by a patent, and, several of the specific steps of the hydrolysis process disclosed by the patent in suit. These processes are not merely the successive steps in a unit process; they are, as we heretofore stated, separate and distinct processes. The claim of unfair competition is obviously based upon two separate and

**54**

distinct causes of action, the violation of two separate and distinct rights derived from different sources. This Court has jurisdiction of one but not of the other.

■ The cause of action based upon the allegedly unlawful appropriation and use of the specific steps of the hydrolysis process is related to the claim for infringement of the patent, supra; the cause of action based on the alleged unlawful appropriation and use of the sulfonation process is not related to the claim for infringement. Therefore the Court has jurisdiction of the former but lacks jurisdiction of the latter. Hurn v. Oursler, 289 U.S. 238, 245, 53 S.Ct. 586, 589, 77 L.Ed. 1148, et seq.; Lewis v. Vendome Bags, 2 Cir., 108 F.2d 16; Newport Industries v. Crosby Naval Stores, 5 Cir., 139 F.2d 611, 612; Zalkind v. Scheinman, 2 Cir., 139 F.2d 895; Algren Watch Findings Co. v. Kalinsky, 2 Cir., 197 F.2d 69, 71, 72; Schreyer v. Casco Products Corp., 2 Cir., 190 F.2d 921, 924. We shall therefore consider only the former cause of action.

■ The law recognizes a property right in trade secrets, and a court of equity will protect the right against invasion by one who appropriates the trade secrets to his own use in violation of a contractual obligation or confidential relationship. Stone v. Goss, 65 N.J.Eq. 756, 55 A. 736, 63 L.R.A. 344; A. Hollander & Son v. Imperial Fur Blending Corp., 2 N.J. 235, 66 A.2d 319; Boost Co. v. Faunce, 13 N.J.Super. 63, 80 A.2d 246, affirmed 17 N.J.Super. 458, 86 A.2d 283; Sun Dial Corp. v. Rideout, 25 N.J. Super. 591, 96 A.2d 788; see also Restatement of the Law, Torts, Sections 757 and 758. However, in the absence of a contractual obligation the right to further protection terminates upon public disclosure of the trade secret by the owner. Carver v. Harr, 132 N.J.Eq. 207, 27 A.2d 895; Sandlin v. Johnson, 10 Cir., 141 F.2d 660; Northup v. Reish, 7 Cir., 200 F.2d 924. The right to protection begins and ends with the life of secrecy.

■ The grant of the patent was a public disclosure not only of the process defined in the claims but also of any trade secrets described in the specifications. Sandlin v. Johnson, supra; A. O. Smith Corporation v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531, 537. The trade secrets, if any, disclosed in the specifications and not claimed as elements of the invention, were dedicated to the public under the patent laws. Royal Co. v. Tweedie, supra; Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 71 F.2d 539, 561, and the other cases hereinabove cited. The patentees had a right, independent of the patent laws, to hold and use their process as a trade secret. They surrendered this right, however, upon full disclosure of their process in return for the patent monopoly. The claim of unfair competition and the claim of infringement are clearly inconsistent insofar as they relate to the same period of time.

The claim of unfair competition can be sustained, if at all, only upon proof that Gamma employed the process of the patent in the manufacture of hydroxyquinoline prior to November 29, 1949, when the patent in suit was granted. The defendant Gamma is, and has been engaged in the manufacture of hydroxyquinoline, but there is no evidence that it was so engaged prior to the grant of the patent. This defendant admits that it acquired possession of the assets of Lenox Laboratories on November 7, 1949, but there is no evidence as to when it commenced commercial operations.

■ The complaint charges that the officers of Gamma conspired with the officers of Lenox to appropriate and convert to their own use the trade secrets of the plaintiff. This charge is not supported by the evidence.

The plaintiff asserts a claim of unfair competition also against the defendant Lenox Laboratories and its officers Biber, Gerlach and Pecherer, who, like the plaintiff, are citizens of New Jersey. There is no claim of infringement made against these defendants, and the claim of unfair competition is not related to the claim of infringement made against Gamma. The respective claims relate to

different periods of time and are predicated on separate and distinct causes of action. It follows that the Court has no jurisdiction of this claim of unfair competition in the absence of diversity of citizenship. French Renovating Co. v. Ray Renovating Co., 6 Cir., 170 F.2d 945. This claim must therefore be dismissed but without prejudice to the right of the plaintiff to pursue an appropriate remedy in a court of competent jurisdiction. This is likewise true of the other claims of unfair competition, to wit, the claim based upon alleged unlawful use of the sulfonation process and the claim based on the alleged unlawful use of certain equipment.

## Conclusions

### I.

The Court has jurisdiction of the claim for infringement, and of the claim for unfair competition related thereto, under Section 1338 of Title 28 U.S.C., 28 U.S.C.A. § 1338. However, the Court lacks jurisdiction over the other claims for unfair competition for two reasons: first, they are not related to the claim for infringement within the meaning of the statute; and second, the parties to this litigation are citizens of New Jersey, and the diversity of citizenship otherwise necessary to the Court's jurisdiction is absent.

### II.

The claims of the patent in suit are valid. This determination is based upon the presumption of validity and the absence of sufficient evidence to overcome this presumption.

### III.

The accused process employed by the defendant Gamma in its commercial operations does not infringe the claims in suit for the reasons hereinabove stated.

### IV.

The claim of infringement and the claim of unfair competition, insofar as they relate to the same subject matter, to wit, the alkali hydrolysis process, and cover the same period of time, are inconsistent. The claim of unfair competi-

tion must, therefore, be dismissed. The other claims of unfair competition must also be dismissed for the reasons hereinabove stated.

### V.

The parties shall prepare and submit to the Court an appropriate order for judgment.