**MIDLAND–ROSS CORPORATION,**
Plaintiff,

v.

**Lucian D. YOKANA and Sterling Extruder Corp., Defendants.**

**Civ. A. No. 687–59.**

United States District Court
D. New Jersey.

July 22, 1960.

McCarter & English, Newark, N. J., for plaintiff, by Francis E. P. McCarter, Newark, N. J., and Jones, Day, Cockley & Reavis, Cleveland, Ohio, of counsel for plaintiff, by Robert W. Poore, Cleveland, Ohio.

Stanton T. Lawrence, Jr., New York City, for defendants, and Pennie, Edmonds, Morton, Barrows & Taylor, New York City, of counsel, for defendants, by Charles E. McKenney, New York City.

WORTENDYKE, District Judge.

This Court has jurisdiction of the parties and of the subject matter of this action by virtue of the provisions of 28 U.S.C. § 1332(a) (1). Plaintiff is a corporation of the State of Ohio and the defendants are respectively a citizen of and a corporation organized under the laws of the State of New Jersey.

At the pretrial conference in this case on April 28, 1960, leave was granted to

the plaintiff (Midland-Ross) to file an amended complaint in which it is alleged, and I find from the evidence hereinafter referred to, that on March 5, 1958, plaintiff acquired the assets of Hartig Engine and Machine Co. (Hartig), a New Jersey corporation, which had been engaged in the designing, manufacturing and selling of plastic extruding machines at a place of business in the latter State. Plaintiff has since continued the operation of that business. In the year 1952 the defendant Yokana entered the employ of Hartig, and continued in the employ of the plaintiff after the latter's acquisition of the assets and business of his former employer. Yokana terminated this relationship by his resignation, which took effect on January 6, 1959. From the outset of his employment by Hartig, Yokana handled its sales and its correspondence, and generally served as an assistant to Edward Greene, its president and principal stockholder. Yokana played an important role in the business activity of Hartig, and was confidently relied upon by Greene. Yokana bore the title of vice-president of Hartig, but when that company was acquired by Midland-Ross, his title was changed to sales engineer. When he joined Hartig, his salary was $8,250, but at the time of the acquisition of the business by the plaintiff, it had increased to $15,750 annually. By reason of the nature and pursuant to the duties of his employment, both by Hartig and thereafter by the plaintiff, Yokana necessarily became intimately familiar with all of the phases of the business, including its production and sales aspects, and had access to all records, drawings, and other similar material relating to the business, its products and operations.

During 1958, the year in which Hartig was acquired by Midland-Ross, Yokana made up his mind to terminate his employment and to enter into a business on his own account similar in character to that in which he was engaged as an employee of Hartig and of the plaintiff. In seeking financing for the corporation which he contemplated forming for the purpose of conducting his own business,

Yokana applied to and succeeded in arranging with persons in control of one of Hartig's corporate customers for their financial participation in his projected enterprise. The terms of the agreement between Yokana and the Messrs. Moss, whose participation was thus secured, were embodied in written form and executed as a contract on January 6, 1959.

Although he attended a sales meeting of plaintiff's Hartig Extruders Division on December 31, 1958, at which a price increase for its products was proposed, Yokana made no mention of his intention to resign, but immediately following that meeting delivered to Mr. Greene his letter of resignation, by its terms to become effective January 6, 1959.

On January 9, 1959, Yokana caused the defendant corporation, Sterling, to be incorporated in the State of New Jersey. He and the nominees of the persons who had agreed to finance the business of the corporation became its principal stockholders. That company immediately entered into the production and sale of plastic extruders generally similar to those produced by the plaintiff; but before the company was actually formed Yokana had procured orders for the purchase from Sterling of such plastic extruders, and had placed orders with various suppliers, including several who were supplying the plaintiff, for parts which Yokana's new company would require in filling its orders for extruders.

During the course of his employment, originally by Hartig and subsequently by plaintiff, and appropriately to his duties therein, Yokana had obtained and used in his sales efforts, production and other drawings and blue prints made and used by his employer, together with customer lists and pricing data compiled and developed in the conduct of the business. Many of these drawings and other documents, which Yokana had a right to possess and use in the performance of his employment duties, were kept by him at his home, as well as at his place of business, and after he terminated his employment relationship, he retained many of these documents, or copies thereof which

he had made or caused to be made. In his sales efforts in behalf of defendant Sterling, as well as in his and its placement of orders with suppliers and subcontractors for extruder parts, Yokana made use of the graphic and documentary material which he had obtained during, and retained after termination of his employment relationship with the plaintiff and its predecessor.

Plaintiff alleges that, by the expenditure of large sums of money and much effort, it and its predecessor had developed new and distinctive designs of plastic extrusion machines and parts thereof, together with dies and accessories for the same, and had accumulated and used in its business a large body of confidential business information or trade secrets pertaining to its products. These included detailed engineering drawings and specifications therefor, sources of supply of parts used in the manufacture thereof, lists of customers and potential customers, and cost and pricing data and sales and pricing policies and programs. Plaintiff charges that, through his employment relationship with plaintiff and its predecessor, Yokana occupied a fiduciary position of trust and confidence, and by reason thereof had access to and acquired knowledge and possession of documents embodying the confidential information and trade secrets of the plaintiff and its predecessor. It is accordingly alleged that Yokana violated his fiduciary obligations to plaintiff and that, with a malicious purpose and intent to injure the plaintiff, he commenced a program for the manufacture and sale of plastic extruding machines in competition with the plaintiff, by the wrongful use of the confidential information and trade secrets which he had acquired in his former employment relationship. Plaintiff complains also that, upon terminating his employment with the plaintiff, Yokana wrongfully retained in his possession and failed to surrender the various documents, blue prints, and other data to which reference has been made.

With respect to the defendant Sterling, plaintiff alleges that Yokana caused that corporation to be organized in furtherance of his breach of his obligations to the plaintiff, and that he and Sterling conspired to appropriate plaintiff's property and business through Sterling's use of such materials, with knowledge of Yokana's wrong and the source of the material made available to it by him. Sterling and Yokana are charged with having secured profits and having been unjustly enriched by the wrongful acts complained of, to the irreparable damage of the plaintiff.

Plaintiff seeks preliminary and final injunctive relief against each of the defendants in the form of a restraint against both of them and those controlled by each of them from further manufacture and/or sale of plastic extruding machines, parts thereof, and dies and accessories therefor, which embody, in whole or in material part, designs or dimensions derived by defendants from drawings or blue prints of drawings of the plaintiff, and from disclosure to others of drawings or other confidential information or trade secrets of the plaintiff, or the use thereof in the manufacture, sale or offering for sale of such products. In addition to the injunctive relief which the plaintiff seeks in this action, it prays for an accounting of profits, compensatory and punitive damages, costs and other appropriate relief.

The substance of the defense offered by the defendants is to be found in the following contentions: (1) Yokana was not in a fiduciary position of trust and confidence during his employment by plaintiff and its predecessor; (2) neither plaintiff nor its predecessor had any confidential information or trade secrets which Yokana could have acquired; (3) the documents of which Yokana came into possession through his said employment, and which he admits retaining, and of which he concededly made and used copies, did not embody confidential information or trade secrets. At the pretrial conference, the defenses were more succinctly summarized as a denial (1) that defendant was in a fiduciary relationship with the plaintiff, and (2) of the

existence of any of plaintiff's trade secrets involved in the manufacture of the machines sold by the defendants.

Defendants include in their answer to the amended complaint a counterclaim charging the plaintiff with unfair competition with Sterling by means of certain alleged misrepresentations set forth in the original complaint; but with this counterclaim I am not presently concerned.

Pursuant to due notice, plaintiff moved in the cause for a preliminary injunction in accordance with the prayers of the amended complaint, and upon the return of the notice of that motion oral testimony and documentary evidence was presented upon issues raised by the amended complaint and the answer thereto. In accordance with the request of the plaintiff, and in the absence of any objection on the part of the defendants, I shall treat the hearing upon the motion for preliminary injunction as a hearing upon the prayer for final injunctive relief.

There is no contradiction in the proofs of the following facts:

(1) Yokana was a trusted employee of plaintiff and its predecessor.

(2) During the course of his employment he became familiar with and properly obtained possession of and used production and other drawings, lists of actual and potential customers, lists of parts suppliers, and price data.

(3) After the termination of his employment, he retained some or all of the foregoing material.

(4) After the termination of his employment, but in furtherance of plans previously made by him, Yokana formed the corporate defendant, Sterling, and through it entered into business competition with the plaintiff, making use of some or all of the material and information which he had obtained during his previous employment and which he had retained upon the termination thereof.

(5) Defendants are merely assembling extruders made of components purchased from various suppliers of the plaintiff. There remain the following two questions for the Court to decide at this time: (1) Did the information which Yokana so obtained in the course of his employment constitute trade secrets which the plaintiff is entitled to enjoin the defendants from using in competition with the plaintiff? and (2) has plaintiff shown the actuality or likelihood of irreparable damage from a continuance of defendants' competition?

██ As an employee, first of Hartig and later of Midland-Ross, Yokana was an agent of his employer, but after the termination of that agency, Yokana was under no duty *not* to compete with his former principal. However, the termination of the agency did not authorize the agent to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. The agent was entitled to use general information concerning the method of business of the principal and the names of customers retained in his memory, if not acquired in violation of his duty as agent. Restat. 2d, Agency, § 396(a) (b). Even before the termination of the agency, he (the agent) was entitled to make arrangements to compete, except that he could not properly use confidential information peculiar to his employer's business and acquired therein. He was not entitled to solicit customers for such rival business before the end of his employment, nor could he properly do other similar acts in direct competition with the employer's business. Id. § 393, comment e. "The privilege to compete with others * * * includes a privilege to adopt their business methods, ideas or processes of manufacture." Restat. Torts § 757, comment a. "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if * * * (b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him * * *." Id. § 757. Comment

b of the cited text section defines a trade secret as "any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Further, "A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sales of goods or to other operations of the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management." However, "matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. * * * An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

■ This being a diversity action, the substantive law of the forum (New Jersey) applies. The courts of this State have dealt with factual situations strikingly similar to that here presented. In Sun Dial Corp. v. Rideout, 1954, 16 N.J. 252, 108 A.2d 442, affirming 1953, 25 N.J.Super. 591, 96 A.2d 788, former employees of the plaintiff corporation were enjoined from using and disclosing a secret process which they had learned in confidence while employed by the plain-

tiff. In that case the New Jersey Supreme Court adopted the definition of a trade secret from Restat. Torts § 757, and cited National Tile Board Corp. v. Panelboard Mfg. Co., Ch.Div.1953, 27 N.J. Super. 348, 99 A.2d 440. The Sun Dial decision states (16 N.J. at page 257, 108 A.2d at page 445) that the subject matter of a trade secret must not be a matter of public knowledge or of general knowledge within the industry, but there must exist a substantial measure of secrecy, although that secrecy need not be absolute, and disclosure to employees involved in the use of the subject matter does not ordinarily destroy the protection afforded the employer. Quoting from Vulcan Detinning Co. v. American Can Co., E. & A.1907, 72 N.J.Eq. 387, 67 A. 339, 12 L.R.A.,N.S., 102, Sun Dial further defines protectable secrecy as " 'That qualified secrecy that arises from mutual understanding and that is required alike by good faith and good morals'." Generalities are often obscurants of the perception of the niceties of factual differences. Distinguishable from the case at bar is the fact, in Sun Dial, that only the defendants, the plaintiff, and the latter's licensees were familiar with the process used by Sun Dial in coating and relieving its precision dials, and the solutions and the agents used for that purpose. From the inception of its business, Sun Dial's plant bore a "No Admittance" sign at the entrance, and all of its employees, as well as others who visited the plant, were told that its process was secret. Visitors were required, before admission to the plant, to sign a register thereby evidencing their agreement not to use or divulge any processing which might be observed on the premises. Moreover, the evidence disclosed that the precautions taken by the plaintiff were effective to prevent any disclosure of its process to others than its employees engaged in the use thereof. Having thus become familiar, through the duties of their employment by the plaintiff, with those admittedly secret processes, certain of its employees resigned from their employment and established the defendant

corporation which immediately began to manufacture dials in competition with the plaintiff. Both the Appellate Division (29 N.J.Super. 361, 102 A.2d 90) and the Supreme Court, found from the evidence that plaintiff's employees learned their employer's trade secrets in confidence, and that in violation of that confidence they used or disclosed such information after the termination of their employment. "It is the employees' wrongful conduct in violating the confidence, by using the uniquely valuable information for purposes other than their employer's benefit, which furnishes a clear and persuasive basis for equitable intervention." 16 N.J. at page 259, 108 A.2d at page 446. Obviously, in the case at bar, the secrecy of the information concededly made use of by Yokana was not equivalent to that which existed in the Sun Dial case.

Sun Dial did not overrule, but distinguished, Boost Co. v. Faunce, App.Div. 1952, 17 N.J.Super. 458, 86 A.2d 283. The Boost case denied injunctive relief to a former employer against former employees who, after severance of their employment, had formed a corporation through which they were manufacturing and selling a soft drink syrup in competition with that manufactured and sold by their former employer. The Chancery Division (13 N.J.Super. 63, 80 A.2d 246) was affirmed by the Appellate Division in dismissing the complaint. The theory of the case was that the defendant employees had acquired, through a confidential relationship with the plaintiff, a secret formula which they, through the corporation which they formed, were using in unfair competition with the plaintiff. Both the decision below and that on appeal in Boost were predicated upon the failure of the evidence to disclose that the defendants were unlawfully using a trade secret acquired in confidence while in the employ of the plaintiff. Plaintiff manufactured a soft drink or syrup known as "Tak-Aboost" allegedly involving a secret formula. Certain of plaintiff's stockholders and employees severed their connection with the company and formed a new corporation under the name of "Drink-Atoast." The new corporation then proceeded to manufacture and sell a soft drink or syrup which it called "Atoast" in competition with plaintiff's product. It was conceded by the parties that the basic ingredients of the soft drink syrup were common to both their products and were commonly known to the trade. There was only a difference in the proportions of the common ingredients used by each of the parties. The Appellate Division held that even assuming that plaintiff's formula constituted a trade secret, knowledge of which was acquired confidentially by the individual defendants, there was no breach of trust on the part of these defendants because of their well-recognized right, upon termination of their employment, to carry away and use the general skill or knowledge acquired during the course of their employment, and further, because trade secrets are not given protection against all the world or persons who have not learned the secret by improper means, or by virtue of a confidential relation. The Court adhered to the rule that "all that the owner of a trade secret is entitled to is protection from a breach of contract or confidence against one to whom he has confided the secret and those to whom such person may divulge it, and anyone who honestly and fairly comes into possession of the secret has the right to use, disclose, or sell it without being subject to restraint by injunction." Citing 43 C.J.S. Injunctions § 148. I consider Boost more apposite to the present case than is Sun Dial. See Excelsior Steel Furnace Co. v. Williamson Heater Co., 6 Cir., 1921, 269 F. 614.

In Adolph Gottscho, Inc. v. American Marking Corp., 1955, 18 N.J. 467, 114 A.2d 438, the Chancery Division of the New Jersey Superior Court (35 N.J.Super. 333, 114 A.2d 19) was affirmed in enjoining plaintiff's former employee, and the latter's corporation formed for the purpose, from utilizing trade secrets which had been disclosed to the employee during the course of his employment.

The Gottscho case expressly followed and adopted the authorities cited in the Sun Dial case, supra. Although in Gottscho some of the plaintiff's secrets were disclosed in patents issued to the plaintiff during the pendency of the litigation, the court found that the former employee did not learn any of the secrets from the patents, but, on the contrary, became familiar with them in confidence while in the plaintiff's employ, and improperly disclosed and used them long after the patents had been issued. The employee's conduct in the Gottscho case was characterized by the Supreme Court, 18 N.J. at page 475, 114 A.2d at page 442, as "grossly improper" and created a cause of action in the plaintiff "based on long-settled equitable principles and supported by the marked changes in the attitude of the law towards the need for commercial morality." The information which Gottscho held to embrace trade secrets consisted of a familiarity, acquired during the employment, with certain novel features of automatic marking and printing machines used to imprint code numbers, lettering and other marks of identification on packages. In that case the former employee did not take away with him when he terminated the employment, any physical designs, drawings or blue prints from which he designed similar machines for his own company, but the trial court found from the evidence that "the knowledge of the principles that Jackson had acquired were (sic) so ingrained in his mind that without resort to the actual blue prints or copies thereof he was capable of redesigning and having them manufactured" by the subcontractor which had made similar products for the plaintiff. With respect to the secret character of certain features of the machines, the trial court in Gottscho found that sufficient precautions had been taken to preserve their secrecy. No equivalent precautions were taken in the case at bar. What the employee learned in Gottscho was a trade secret. What Yokana learned in the case at bar was not in that category. All features and functions of the machines were as familiar to the public as are those of the automobile. See Carver v. Harr, Ch.1942, 132 N.J.Eq. 207, 27 A.2d 895; Ferber Corp. v. Northern Industrial Products Inc., Ch.Div.1951, 15 N.J.Super. 283, 83 A.2d 372, affirmed App.Div.1952, 18 N.J.Super. 493, 87 A.2d 549.

In support of its claim for injunctive relief the plaintiff here relies *inter alia* upon Consolidated Boiler Corp. v. Bogue Electric Co., Chanc.1948, 141 N.J.Eq. 550, 58 A.2d 759, but to my view that cited case is also distinguishable. In the first place, in Consolidated, the right sought to be protected and enforced arose out of a written contract between the complainants (patentee and assignee of patent) on the one hand, and a boiler manufacturer on the other. By the terms of that contract the manufacturer agreed not to manufacture, sell or deliver to any person, firm or corporation, any boiler constructed in accordance with the drawings annexed to the agreement. In the second place, pending his application for a patent upon the boiler, the complainant-inventor submitted a sketch of his invention to the president of the defendant manufacturer, informing the latter that he had not yet obtained a patent but that the boiler was his "baby" and that he wanted to keep the idea entirely within his own control. The inventor therefore requested, and the manufacturer, through its president, promised that the plans for the boiler so disclosed would be kept a secret. The written agreement between the parties, upon which the cited suit was predicated, was entered into in compromise of other litigation between the parties instituted between the time of the disclosure of the drawings to the manufacturer and the execution of the settlement contract. In upholding the validity of the covenant in the settlement agreement, the Court held that the manufacturer would not be permitted to make competitive use of the boiler or of its plans because of the recognition in the covenant of the property rights of the complainants. The information disclosed by the inventor to the manufacturer was

clearly confidential, and the ultimate written agreement recognizing the property rights of the complainants in the subject matter thereof was enforceable by injunction. Such is not the situation confronting us here. While it is true that what Yokana has used in conducting the business of Sterling embodies information which he acquired during and through his employment relationship with the plaintiff and its predecessor, that information does not fall within the category of "trade secrets" so as to entitle the plaintiff to enjoin the further use of the information by either of the defendants.

Plaintiff concedes that a former employee has the right to conduct legitimate competition with his former employer, and that in so doing the employee may use the skill and aptitude acquired in his employment, together with information which is within the general knowledge of competitors in the trade. Plaintiff also admits that Yokana might, with complete impunity, produce imitations of plaintiff's extruders by learning their unpatented designs and dimensions from an examination of products which the plaintiff had sold. Plaintiff contends, however, that the information used by Yokana was not generally known to competitors of the plaintiff, but was the result of work and effort on the plaintiff's part in its production, and, therefore, was a "trade secret" within the meaning of the cases which hold that the information may not be used for the purposes for which Yokana admits he is using it.

Yokana admits that he used tracings of plaintiff's drawings for the production of the extruders which Sterling has manufactured and sold. He concedes that the plaintiff would not knowingly turn over its production drawings to a competitor, and that, commencing on a date prior to the termination of Yokana's employment by Midland-Ross, drawings which were used in the latter's sales activities were stamped with a legend to the effect that they were the property of the plaintiff and not to be used for purposes other than those for which they were provided.

Plastic extruding machines have been made by many different manufacturers for several years. All of such machines are generally of a similar type of construction. From a schematic drawing furnished by the plaintiff during the hearing for the instruction of the Court, it appears that most plastic extrusion machines consist of the same type of general parts, performing similar functions, as follows:

The revolutions of the shaft of an electric motor are reduced through a gear box or reducer and transmitted through a thrust shaft collared with a thrust bearing and radial bearing. These bearings are enclosed in a thrust housing, which is separated by an air spacer, from the throat, into which the raw material, in powder or pellet form, is introduced from a vertical hopper. The element which ultimately performs the extrusion consists of a screw or worm keyed to the thrust shaft, which by means of beveled lands and grooves forces the material through the heated barrel in which the screw operates, and out through the die at the far end of the barrel in the ultimate finished form of the product. The extruder operates upon the same general principle which is employed by the housewife when she grinds chunks of meat for use as one of the components of hash. The source of power in that well-known homely device is the crank which is operated by hand. The raw material is introduced through the hopper and then forced horizontally by the screw, turned by the handle, through the perforated disk at the extrusion end where the meat emerges in fragments formed by the holes in the disk. The electric heater which surounds the exterior of a section of the barrel of the plastic extruder serves to melt the dry raw material into a viscous consistency permitting its ultimate extrusion and solidification at the extrusion end of the device. See "Principles of Plastic Screw Extrusion" by Gore, Carley & McKelvey, in 9 Society of

Plastics Engineers' Journal (March 1953).

In its uncopyrighted illustrated catalogues, distributed to the public in advertisement of its products and as an invitation to purchasers, plaintiff enumerates and illustrates the main components of its extruder, viz.: (1) variable speed motor drive; (2) worm and herringbone gear reducers; (3) thrust bearing assemblies, consisting of a spherical roller bearing for radial loads and a self-aligning spherical roller bearing for thrust loads, completely enclosed in a bronze housing and force lubricated; (4) fabricated throat section for the provision of water cooling; (5) steel barrel with centrifugally cast Xaloy liner, electrically heated by means of band heaters, or cast-in aluminum Calrod heaters, and controlled air or water cooling along entire length of barrel; (6) alloy or stainless steel screw with Stellite tipped flights (of varying length to diameter ratios); (7) clamp type closure; (8) temperature controls of proportioning type or stepless (saturated core reactors).

Most if not all of the extruders sold by plaintiff and its predecessor, as well as by Sterling, were assembled with parts made by various suppliers, although Hartig did much experimenting in the course of evolving the production drawings, many of which the defendant Yokana admittedly kept and copied. Sterling used the same suppliers, for certain of the parts of its extruders, who had been used by Hartig and the plaintiff. In ordering its parts from subcontractors, Hartig and the plaintiff furnished those suppliers with drawings or blue prints of drawings upon the basis of which the parts were manufactured by the subcontractors. Sterling not only used copies of many of the Hartig drawings which Yokana had taken, but also, in some instances, ordered parts from plaintiff's suppliers which were fabricated from drawings or blue prints which plaintiff or Hartig had furnished to such suppliers for its and their use. The evidence is rather clear that, throughout the periods of Yokana's employment by Hartig and by the plaintiff, as well as the succeeding period during which Yokana operated through Sterling, thermoplastic extrusion machines were in general use in various industries, were manufactured or assembled by numerous producers, and conformed generally to the type hereinabove described. Not only did plaintiff (and Hartig) furnish its parts suppliers with drawings for the purpose of enabling the suppliers to fabricate the parts needed, but in furtherance of its sales efforts, furnished to customers and potential customers drawings and blue prints, not only for the purpose of assisting the customers in determining upon the particular diameter of barrel most suitable for its extruded product, but also to facilitate purchasers of plaintiff's machines in placing orders with plaintiff for replacement parts.

I am unable to find in the evidence that in retaining and copying plaintiff's drawings and blue prints, Yokana was guilty of any misappropriation of plaintiff's trade secrets. I reach this conclusion because I do not find that the materials and knowledge with which Yokana became familiar and which he acquired while in the plaintiff's employ, and which he used for the benefit of Sterling, constituted trade secrets. Obviously the drawings and blue prints furnished to Yokana by, and to which he had access through, his employer, were the property of the employer which it expected its employee to use only in the furtherance of the employer's business. As has already been stated, although Yokana, through his employment, had become familiar with plaintiff's product, he would nevertheless be entitled, after the termination of his employment, to manufacture and sell a similar product in competition with his former employer, except to the extent that his ability to do so involved the use of trade secrets of his former employer which had been disclosed to him in confidence during his employment. As far as the form and method of functioning of the plaintiff's machines are concerned, I find nothing secret about them. Such

details respecting these products as Yokana might be able to carry in his mind with or without the benefit of notes which he might make for his own guidance, or which he might obtain through use of plaintiff's publicly distributed catalogues or drawings, would not expose him or Sterling to injunctive interference or damages. However, as far as is disclosed by the evidence before me, Yokana had no right to retain drawings or blue prints which were the property of his employer after the termination of his employment, nor had he any right to retain or use his employer's customer lists, price lists, or pricing data for his own, or the purposes of the corporation which he organized to compete with plaintiff. The plaintiff is, therefore, entitled to the return to it by the defendants of all drawings and blue prints which Yokana took from the plaintiff and Hartig. With respect, however, to drawings, blue prints and specifications of parts which plaintiff and its predecessor had delivered to and allowed to be retained by its suppliers, Yokana and Sterling were entitled, with the consent of such suppliers, to avail themselves of such data in specifying orders for the supply of parts. Plaintiff contends, upon the authority of Pressed Steel Car Co. v. Standard Steel Car Co., Pa.1904, 210 Pa. 464, 60 A. 4, that the suppliers had no right to make available to Sterling the patterns, drawings and specifications which plaintiff had furnished to the supplier. Of course, none of the suppliers of the plaintiff has been made a party to the present litigation. Any injunction which this Court might issue against the use by suppliers of plaintiff's drawings in their possession would be ineffective. If Sterling should order the fabrication of a part from a supplier by referring to the type furnished or being furnished to the plaintiff, and such supplier should use, in filling such order, a drawing which had been furnished to it by the plaintiff, the present defendants would not be in contempt for using the part so supplied.

■ Plaintiff clearly had a property right in the customer lists, price lists, price calculations, sales forecasts, and similar material accumulated and developed by the plaintiff and its predecessor during the employment of Yokana. See Board of Trade of City of Chicago v. Christie Grain & Stock Company, 1905, 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031. How shall relief upon this aspect of the case be afforded? Yokana doubtless became acquainted with plaintiff's customers through his numerous contacts with them while he was sales engineer for that company, and previously when he was in charge of sales as vice president of Hartig. Indeed, when he decided to leave the plaintiff's employ and go into business for himself, he had a perfect right to notify these customers of his intention, and to receive orders from them if they chose to give them to him. The proprietors of one of plaintiff's customers, the Mosses, entered into the new Sterling enterprise with Yokana. The evidence discloses that representatives of many other customers of Hartig, or of the plaintiff, elected to transfer their companies' business to or to give some of it to Sterling, for a variety of reasons, which included considerations of better delivery, better service, dependability, friendship for Yokana, more favorable prices and terms, post-purchase service and technical assistance, and dissatisfaction with the plaintiff. Therefore, while Yokana is obligated to return to the plaintiff whatever customer lists, price and cost data he has which may belong to the plaintiff, he is under no obligation to force himself to forget what he may recall of the information contained therein. Indeed, such a directive would be an absurdity because unenforceable.

■ Finally, although the evidence discloses that Yokana, through Sterling, has done well financially in his own business, there has been no proof offered by the plaintiff that it has suffered or is likely to suffer irreparable damage by reason of the use by Yokana and Sterling of information which Yokana obtained

during his employment by the plaintiff and its predecessor. Indeed, plaintiff's sales during the year following Yokana's resignation increased approximately 20% over those during the preceding year. Plaintiff here seeks both injunctive relief and damages. In order to entitle it to injunctive relief, there must be a showing that the plaintiff has suffered or will probably suffer irreparable harm and that legal remedies are inadequate. Beacon Theaters, Inc. v. Westover, 1959, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988. I find no proof of irreparable injury upon the basis of which an injunction should issue in this case. While plaintiff might be entitled to an accounting by Sterling of such profits as plaintiff can prove that the defendants gained through the misuse of customer lists, cost tabulations and price data which it may have obtained through Yokana from the plaintiff, I find no evidence thus far presented of any such misuse. Although following Pennsylvania law, the Third Circuit Court of Appeals in Sears Roebuck & Co. v. L–M Manufacturing Co., 1958, 256 F.2d 517, held that a customer list procured under circumstances giving rise to a relationship of trust, can be considered a trade secret, such is also the rule in New Jersey. Golden Cruller & Doughnut Co., Inc. v. Manasher, Chanc.1923, 95 N.J.Eq. 537, 123 A. 150; citing Stone v. Grasselli Chemical Co., 65 N.J.Eq. 756, 55 A. 736, 63 L.R.A. 344.

I am unable to find in the evidence any basis for concluding that the defendants have unfairly competed with the plaintiff by defendants' retention and use of its drawing and blue prints, either in the production of Sterling's products, or in the formulation of specifications and placing of orders by means of which Sterling procured from suppliers of the plaintiff parts for Sterling's own product. I do find, however, that Yokana unlawfully retained drawings and blue prints which belonged to the plaintiff or its predecessor, and which were furnished to him for use in the performance of the duties of his employment. The defendants, therefore, will be directed to return such documents to the plaintiff. I further find that Yokana had no right to retain and use for his own purposes and those of Sterling, plaintiff's customer lists, cost calculations and pricing data. Such documents and any copies thereof made by or for the defendants, must also be returned by the defendants to the plaintiff. Except to the extent that I am requiring the return of drawings, blue-prints and other documents, I deny plaintiff's prayer for preliminary and final injunctive relief. In so doing I am not precluding the presentation of evidence, if available, upon the issue of damages, if any, suffered by plaintiff in consequence of defendant's use of plaintiff's customer lists, cost calculations, and pricing data. See Schreyer v. Casco Products Corp., 2 Cir., 1951, 190 F.2d 921.

This opinion shall serve in lieu of the findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P. 28 U.S.C.A.

An order may be presented in conformity with the views herein expressed.