615 So.2d 1192 (1993)
ACI CHEMICALS, INC., Harvey E. Patterson and Doris Patterson
v.
METAPLEX, INC., its Officers, Directors, and Stockholders, Howard Keith Settles, Andrew J. Hamilton, David A. Needham, June Depriest, James Smith, William Thompson, Kathleen M. Thompson, and Otto Rosenkranz.
No. 89-CA-0413.
Supreme Court of Mississippi.
March 18, 1993.
*1193 Stephen L. Beach, III, T.E. Davidson, Jackson, for appellants.
John H. Fox, III, Fox & Earwood, Jackson, for appellees.
Before HAWKINS, P.J., and PITTMAN and BANKS, JJ.
*1194 PITTMAN, Justice, for the Court:
On February 6, 1986, ACI Chemicals, Inc., a Texas Corporation (hereinafter ACI), filed a complaint for injunction and damages against Metaplex, Inc., a Mississippi Corporation, and Howard Keith Settles and Andrew J. Hamilton, residents of Hinds County, Mississippi. ACI alleged that the defendants obtained trade secrets and used them in their business to the financial injury of ACI, that the defendants wilfully interfered with ACI's business and contractual relationships with its customers, that Settles and Hamilton breached their fiduciary duty to ACI, and that Settles and Hamilton maliciously made false statements to ACI's customers regarding their products. The defendants filed an answer and counterclaim alleging that ACI through the acts of Harvey E. Patterson and Doris Patterson brought suit wilfully and maliciously for the purpose of defaming the defendants and destroying their business. The chancellor concluded that the defendants (hereinafter Metaplex) were entitled to nominal damages in the amount of $100, punitive damages in the amount of $44,965.76, and attorney's fees in the amount of $44,965.76.
ACI appealed the chancellor's decision to this Court with supersedeas in the amount of $112,539.40. Finding no reversible error with respect to the punitive damages award and the award of attorney's fees, this court affirms those awards. The award of nominal damages, however, is reversed and rendered.

I.
After graduating from college in 1948 with a degree in chemistry, Harvey Patterson went to work for Dow Chemical Company. In 1950, he changed jobs and went to work for American Chemical Paint Company which is now Am-Chem Products. Patterson was laid off in 1975. Although he signed a non-competition agreement with Am-Chem, it was not enforced and within 90 days of his termination, Patterson had formed his own company, ACI Chemicals, and was selling products in competition with Am-Chem. In fact, his first customer was a former Am-Chem customer.
Shortly after graduating from college, Keith Settles also took a job with Am-Chem Products as a salesman in 1973. For a time, Patterson was Settles' regional manager at Am-Chem. Settles left Am-Chem in 1978 to work for ACI, and he was able to take several Am-Chem customers with him.
In 1983, Patterson hired Andrew Hamilton as a chemist. Hamilton was a research chemist for Am-Chem from 1967 to 1980. According to Settles and David Haynes, a former salesman for ACI, Patterson hired Hamilton to get the Inland Steel account, later known as the Van Leer account. Patterson, however, testified that the only reason he hired Hamilton was because he was a good chemist.
In May of 1985, Settles received a non-competition contract in the mail from Patterson. According to Settles, Patterson promised him that he would not have to sign a non-competition contract when he left Am-Chem to come work for ACI. Settles refused to sign the contract. On July 5, 1985, Patterson came to Jackson, Mississippi, to discuss the matter with Settles. Settles still refused to sign the contract and his employment was terminated. Patterson took away Settles' company car and all company documents. Settles signed a document stating that he had returned all company documents in his possession.
As a result, Settles decided to go into business for himself, and he formed Metaplex which was incorporated in July of 1985. Stock was issued and Metaplex commenced operation in September of 1985.
Hamilton, as well as all other ACI employees, was also presented with a non-competition agreement. He refused to sign the contract, and he quit on September 15, 1985. Approximately ten days later, Hamilton went to work for Metaplex.
Both Metaplex and ACI are in the business of developing, mixing, and selling chemicals used to clean metal prior to painting. Metaplex made its first shipment in October of 1985. Several of ACI's customers *1195 started doing business with Metaplex. Patterson filed suit against Metaplex, Settles and Hamilton. Metaplex filed a counterclaim. Upon trial, the lower court awarded Metaplex damages totaling $90,031.52. ACI appealed the lower court's decision to this Court.

II.
ACI contends that the action of the lower court in dismissing its complaint was contrary to the applicable law and contrary to the overwhelming weight of the evidence. Count I of ACI's Amended Complaint alleges misappropriation of proprietary information and trade secrets. ACI contends that Settles and Hamilton acquired trade secrets such as chemical formulas while in the employ of ACI and are now using those secrets to the detriment of ACI.
In the case at hand, Settles and Hamilton refused to sign a non-competition agreement. Thus, they could compete with ACI as long as they did not use any trade secrets belonging to ACI.
Absent a covenant not to compete, it is not wrongful for an employee to terminate his employment and accept a position with a competitor, unless, of course, the latter lures him away for the purpose of acquiring a trade secret... .
An employee, upon the termination of his employment, is free to draw upon his general knowledge, experience, memory and skill, howsoever gained, provided he does not use, disclose or impinge upon any of the secret processes or business secrets of his former employer. This rather piously oversimplified principle is much easier to state than to apply.
2 Callman, Unfair Competition, Trademarks and Monopolies § 14.24 (4th ed. 1982) (footnotes omitted).
ACI asserts that Metaplex's formulas are essentially the same as those used by ACI, and as a result, they constitute trade secrets. In Cataphote Corporation v. Hudson, 422 F.2d 1290 (5th Cir.1970), the Fifth Circuit distinguished trade secrets from patents.
Consideration of the trial court's language requires comparison of trade secrets and patents and the requirements of each.
A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

Water Services, Inc., v. Tesco Chemicals, Inc., 410 F.2d 163, 171 (5th Cir.1969), quoting from Restatement of Torts (1939) § 757, Comment b, p. 5. .. . Protection of trade secrets is a form of protection against use by others, focusing upon inequitable use by another  by breach of contract not to reveal, or abuse of confidence, or impropriety in obtaining the secret. Restatement, supra, § 757, Comment a, p. 4; Developments  Competitive Torts, 77 Harv.Law Rev. 888, 948 (1964)... . The trade secret is protected only so long as competitors fail to duplicate it by legitimate, independent research. Water Services, Inc., supra. The trade secret is protected by being kept secret... .
The subject matter of a trade secret must be secret. An item or process of public or general knowledge in an industry cannot be appropriated by one as his own secret.
... Its protection is not based on a policy of rewarding or otherwise encouraging the development of secret processes *1196 or devices. The protection is merely against breach of faith and reprehensible means of learning another's secret.
Cataphote, 422 F.2d at 1293-94 (footnote omitted).[1]
Hamilton was called as an adverse witness, and he testified extensively as to the chemical formulations used by ACI and Metaplex. According to Hamilton, the products used by ACI are basically the same as those used by Am-Chem and Metaplex. Hamilton testified that several of ACI's and Metaplex's formulas were similar if not almost identical. They are also similar and almost identical to the products sold by Am-Chem. Most of the formulas at issue contained the same components, but slightly different percentages of the components were used in the products.
Hamilton contended that the basic formulas for the products sold by ACI, Metaplex and Am-Chem are known throughout the industry. This testimony was corroborated by Percy A. Satoris, president of Bulk Chemicals. Satoris was also employed by Am-Chem at one time. He left the company to start his own chemical company to compete with Am-Chem. Satoris testified that he and Patterson consulted each other regarding chemical formulations. Although they had comparable products, they would refer to a formula in terms of its Am-Chem name because that was the "common denominator" between them. Satoris further testified as follows:
A: Well, as I stated earlier, since not only Mr. Patterson and myself, but there were  and I don't know how many are right at the moment, but there are approximately six or seven small chemical companies, such as ourselves, that were founded by ex-Am-Chem personnel... . And, naturally, we not only somewhat had a working knowledge of what was in the products and who was using them ... as a result of our association with Am-Chem, but Am-Chem also was one of the major, along with Parker, are the two major competitors in this business, and they had most of the business. So that if you were going to compete in this industry, you had to have products that were similar to in order to compete, or identical with, in some cases, because people would not  they would make a change if you could say that they were so close that they were identical or you couldn't tell the difference, or whatever, or they were exactly the same or they were similar to, very similar to. And, of course, the acceptance by prospective customers was based on their need to know whether they were. And, so, you have to follow the leader. If they've got the business and you want to go in there and sell against them, it's very difficult to sell against them unless you have something that's so outstandingly better that it sells itself or something similar to and be competitive on a cost basis.
Settles and Hamilton contend that Patterson is trying to prevent them from doing exactly what he did. When Patterson left Am-Chem, he started his own company and within 90 days, he was selling products to a former Am-Chem customer.
Settles and Hamilton further argue that Patterson should not be allowed to prevent them from competing in light of the "unclean hands" doctrine. According to Settles and David Haynes, a former salesman for ACI, Patterson hired Hamilton to get the Inland Steel account, later known as the Van Leer account. Hamilton developed a formulation for Inland Steel while he was employed by Am-Chem. Settles knew this and encouraged Patterson to obtain the services of Hamilton. After Hamilton was employed by ACI, Inland Steel became a customer of ACI. Once Hamilton left ACI, Metaplex eventually obtained the Inland Steel/Van Leer account. Patterson knew that Hamilton was familiar with the Am-Chem formulas.
Whenever a trade secret is in dispute, the ultimate decision depends upon a balancing of the interests and the question of justification becomes paramount. Such a situation arises when the conflicting *1197 right of employer and employee are involved. The employer's interest in the secret must be crystal clear to justify the restraint of the employee, for whom it may have become part of his general knowledge and experience.

Trade secrets obtained by wrongful means should not be protected in the hands of the misappropriator. An employer who obtained secrets in this fashion will not be protected against his own employee's disclosure of such unlawful or wrongful conduct.
2 Callman, supra, § 14.20 (footnote omitted).
In concluding that no trade secrets were involved, the chancellor based his opinion on the Cataphote decisions. In Cataphote, the defendant, Hudson, was a skilled mechanic who designed and manufactured devices used or sold by Cataphote. He left his employer and seven years later he started a company that competed with Cataphote. There was no non-competition agreement. Cataphote brought suit alleging that Hudson was violating certain trade secrets. The United States District Court for the Southern District of Mississippi held that Cataphote had failed to establish that a trade secret existed. The Fifth Circuit, however, reversed that decision and remanded the case to the lower court "for specific findings and conclusions, under correct standards, of whether Cataphote's claims are in fact trade secrets, and if they are of whether defendants are illegally appropriating them." Cataphote, 422 F.2d at 1295.
Upon remand, the District Court once again found in favor of Hudson.
On separation from plaintiff's employ, Hudson took no drawings, designs, plans, or any written matter with him. The knowledge he took with him was not acquired illegally, but through his employment and as a result of his own talents. He waited seven years before undertaking to be competitive. He was under no contract or written agreement not to compete, but solely under an implied legal obligation not to violate a confidential relationship. All of these facts and conclusions are set forth in the former opinion, and the Court has applied equitable doctrines. Although Water Services, Inc. v. Tesco Chemicals, Inc., 5 Cir., 410 F.2d 163, cited by the Appellate Court in its remand, involved a Georgia covenant not to compete, no such covenant being pled herein, Judge Wisdom said: "But since it may be difficult to determine, as a matter of law, what is a trade secret, the covenant not to compete is a pragmatic solution to the problem of protecting confidential information." This, plaintiff Cataphote, failed to provide for itself.

Cataphote Corporation v. Hudson, 316 F. Supp. 1122, 1123 (S.D.Miss. 1970), aff'd, 444 F.2d 1313 (5th Cir.1971) (emphasis added).
After discussing the Cataphote cases in his opinion, the chancellor held:
[T]his Court finds that there were no trade secrets involved under this definition, and, if so, the equitable principles set forth herein would have to apply, and, in fact, apparently the Plaintiffs knew and recognized this, or they would have not insisted on the Defendants executing a non-competition agreement, as suggested by Judge Wisdom... . This is what precipitated the Defendants leaving the employ of the Plaintiffs and going into competition for themselves.
In light of the difficulty acknowledged by the authorities regarding the determination of the existence of trade secrets and the testimony introduced at trial, the chancellor's decision should not be disturbed.
Count II of the Amended Complaint alleges that Settles and Hamilton participated in the manufacture of chemical products from formulas pirated from ACI, and that they pirated and used ACI's customer information and wilfully interfered with ACI's business. According to Patterson, Settles kept a list of his customers. Settles, however, signed a document stating that he had returned everything to ACI, and denied keeping any customer lists. When asked on cross-examination if he ever asked Settles to return the customer lists, Patterson stated that he had not.
In Midland-Ross Corporation v. Yokana, 185 F. Supp. 594 (D.N.J. 1960), aff'd, 293 *1198 F.2d 411 (3rd Cir.1961), the New Jersey District Court held:
[T]he termination of the agency did not authorize the agent to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. The agent was entitled to use general information concerning the method of business of the principal and the names of customers retained in his memory, if not acquired in violation of his duty as agent. Restat.2d, Agency, § 396(a)(b). Even before the termination of the agency, he (the agent) was entitled to make arrangements to compete, except that he could not properly use confidential information peculiar to his employer's business and acquired therein. He was not entitled to solicit customers for such rival business before the end of his employment, nor could he properly do other similar acts in direct competition with the employer's business. Id. § 393, comment e.
Midland-Ross, 185 F. Supp. at 598.
Patterson failed to show that Settles solicited any business before his departure from ACI. Furthermore, of the seven customers acquired by Metaplex from ACI, five of them were customers upon whom Settles called on during his employment with Am-Chem. The chancellor did not err in denying ACI any relief on Count II.
Count III of the Amended Complaint alleged that Settles and Hamilton breached their fiduciary duty owed to ACI as employees. Patterson, however, was unable to show any drop in sales or loss of customers until after Settles and Hamilton had terminated their employment with ACI. Patterson relied heavily on the fact that Settles had incorporated Metaplex before he was terminated and was producing and selling products within three months of his termination. As noted by the court in Midland-Ross, however, an agent is entitled to make arrangements to compete even before his termination. Id. at 598.
Patterson also accused Hamilton of doing consulting work for a competitor while employed by ACI. Gerald Watson, a former employee of ACI who was also fired for refusing to sign the non-competition agreement, formed his own chemical company and went into competition with ACI. According to Watson and Hamilton, Watson presented some formulas to Hamilton to see if they would work. Hamilton told Watson that they were sufficient. They further testified that the formulas involved were not ACI formulas.
Watson also gave Hamilton a check in the amount of $500 prior to Hamilton's termination. At the bottom of the check there was the notation that the proceeds were for future consultation services. Watson and Hamilton both contend that the check was really in the nature of a loan due to Hamilton's impending termination.
The chancellor in his opinion made note of their testimony regarding the consultation and the check. He noted that Hamilton was concerned that he was about to be "canned" and that he and Watson considered the check as a loan. The chancellor properly denied ACI any relief on Count III.
Count IV of the Amended Complaint alleged that Settles and Hamilton contacted customers of ACI and maliciously made false statements regarding ACI and its products. ACI offered the testimony of Gregory Johnson Dee, a former employee of ACI, and Darryl Ray McClendon, a current employee of ACI, to support its allegation.
According to Dee, Settles made derogatory comments with respect to the Pattersons and their business dealings. Dee stated that Settles was considering starting his own company. McClendon testified that Settles was trying to convince him and Dee not to sign the non-competition agreement, and that Settles also tried to convince him to divert sales away from ACI.
Dee and McClendon, however, did sign the non-competition agreement, and did not divert any sales away from ACI. Even if Dee and McClendon were telling the truth, *1199 ACI was unable to show that the comments had any adverse affect.
Dee also testified that Settles made personal references about Patterson's son and daughter. These comments (if made) have nothing to do with ACI's business relationship with its customers. They were not communicated to a customer and have nothing to do with ACI's products.
Finally, ACI contends that the chancellor did not consider the evidence which was favorable to ACI since he failed to address the credibility of the witnesses in his opinion. Although most of the testimony was conflicting as to the facts of the case, ACI argues that the chancellor should have ruled in favor of ACI given the false testimony of Settles which ACI describes as "blatant."
In the absence of any reference to Settles' false testimony in the findings of fact, ACI contends that the chancellor's decree is not justified upon review of the evidence and facts. In Pace v. Owens, 511 So.2d 489 (Miss. 1987), this Court held:
When a trial court makes no specific finding of fact, this Court often assumes that it resolved fact issues in favor of Appellee... . Further, when there are no specific findings of fact, we sometimes assume the trial judge made determinations of fact sufficient to support the judgment... . In such circumstances this Court must look to the evidence and see what state of facts, if any, will justify the decree.
Id. at 491-92 (citations omitted).
ACI bases much of its argument on Settles' testimony regarding the Certificate of Incorporation for Metaplex signed on July 2, 1985, in Jackson, Mississippi. At trial, Settles testified to the following:
Q: And you did sign this document on July 2, 1985?
A: As I recall, yes, I did.
Q: Well, it's notarized on that day. Do you have any fault with the accuracy or inaccuracy of it?
A: No, I do not have.
Q: Okay... . [T]ell the Court basically what transpired after you and Mr. Needham got to Mr. Fox's office.
A: There was the initial exchange of amenities, and then the business at hand was to sign these papers.
... .
Q: But as far as July 2, 1985, there's no doubt in your mind about that, is there?
A: Not really, no.
ACI, however, introduced an expense account prepared by Settles while he was working at Am-Chem for the week commencing June 30, 1985, and ending Friday, July 5, 1985. According to the expense account, Settles was in Searcy, Arkansas on July 2, 1985.
Q: So were you or were you not in Mr. Fox's office on July 2, 1985, at any time of day, particularly when your signature was notarized by his secretary?
A: According to this, I could not have been.
Q: Well, now, I asked you that question three times, if there was any contest in your mind about where you were on July 2nd, and you told this Court no, that's the absolute truth. Isn't that what you told this Court?
A: I said to the best of my recollection, Mr. Beach, and it's three years ago, and these corporate matters were turned over to Mr. Fox. I didn't really get involved with them. I instructed the man to incorporate us.
Paula Case, the notary public, testified as follows:
Q: And in that acknowledgement it says that "This day personally appeared before me, the undersigned authority H. Keith Settles." Did Mr. Settles in fact personally appear before you on July 2nd of 1985?
A: If the date was there and I signed it, that should have been the date that he was there. I signed it on that date, is what this seems to be. I don't really recall. That was two years ago.
Q: I understand that.
A: Three years ago.
... .
Q: Did Mr. Settles actually sign that document in your presence?

*1200 A: That's his signature, and I notarized it.
... .
Q: I'm going to hand you  before we leave Exhibit 4, do you know whether in fact that document was signed by Mr. Settles on July 2nd or whether it was signed prior to July 2nd?
A: It could have been signed prior and that was my mistake, but that is Mr. Settles' signature.
ACI refers to Settles' testimony regarding his whereabouts on July 2, 1985, as a "blatant falsehood." As a result, ACI contends that the rest of his testimony should be considered as suspect where it is contradicted by other witnesses.
The chancellor, however, did summarize Settles' testimony in the Findings of Fact section of his 33 page opinion. He noted the fact that there were questions concerning the Certificate of Incorporation.
There were questions concerning the dating of the charter and the waiver of notice of the organizational meeting and the minutes, and exhibits showing the corporate records were introduced... .
According to Settles, he testified to the best of his recollection. Upon review of the chancellor's decision, it is reasonable to assume that the chancellor did not view Settles' testimony in the same light as that suggested by ACI. Pace, 511 So.2d at 491-92. This Court often assumes that fact issues are resolved in favor of the Appellee. Id. The chancellor's decision should not be disturbed simply because he did not specifically state whether or not, in his opinion, Settles was truthful about his whereabouts on July 2, 1985. The chancellor filed a 33 page opinion in which he summarized the testimony of the witnesses and, based on his findings of fact therein, ruled in favor of Metaplex.
ACI lists several other portions of testimony at trial that conflicted. Likewise, given the extent and depth of the chancellor's opinion, the fact that he did not specifically decide whose testimony was correct in each instance does not mandate reversal of this case. Pace, 511 So.2d at 491-92.
In light of the testimony and evidence presented at trial, the chancellor's conclusion that ACI failed to meet its burden of proof on all counts is not contrary to the law or against the overwhelming weight of the evidence.

III.
ACI also contends that the lower court's judgment in favor of Metaplex was contrary to the applicable law and contrary to the overwhelming weight of the evidence. In ruling in favor of Metaplex, the chancellor stated the following:
This Court, therefore, specifically finds that the plaintiffs failed to meet their burden of proof on the Complaint, but that the Counterclaimants have met their burden of proof on both abuse of process and tortious interference with a business relationship and that the Counterdefendants and their corporate officers are also personally liable, and that the Counterclaimants are entitled to a judgment for damages, jointly and severally, as to all Counterdefendants. Mississippi Printing v. Maris, West & Baker, 492 So.2d 977 (Miss. 1986).
(emphasis added)
In Dunn v. Koehring Co., 546 F.2d 1193, reh'g granted in part on other grounds, Hyde Const. Co., Inc. v. Koehring Co., 551 F.2d 73 (5th Cir.1977), the Fifth Circuit noted:
Abuse of process is defined in Mississippi jurisprudence as "the intentional use of legal process for an improper purpose incompatible with the lawful function of the process by one with an ulterior motive in doing so, and with resulting damages."
Dunn, 546 F.2d at 1199 n. 19.
Furthermore, in Protective Service Life Insurance Company v. Carter, 445 So.2d 215 (Miss. 1983), this Court dealt with the requirements necessary to prove a prima facie case for wrongful interference with the business relations or contracts of another:
A prima facie case of wrongful interference with a contract is made out if it is alleged (1) that the acts were intentional *1201 and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted.
Id. at 217 (quoting Irby v. Citizens National Bank of Meridian, 239 Miss. 64, 67, 121 So.2d 118, 119 (1960)).
In finding for Metaplex with respect to abuse of process and tortious interference with a business relationship, the chancellor made the following holding:
[T]his Court finds from the facts that the wrongful conduct involved herein was intentional and resulted from gross disregard for the rights of the Counterclaimant [Metaplex] so as to amount to willfulness on the part of the Counterdefendants [ACI]. The Counterdefendant's conduct was wanton, reckless and indifferent to the rights of the Counterclaimants by bringing this action attempting to enjoin them and prevent the Counterclaimants in engaging in a legitimate business undertaking simply because it was in competition with their products. .. .
... [T]his Court is of the opinion that the evidence overwhelmingly exceeds the preponderance of evidence rule and is clear and convincing that the acts of the Counterdefendants were intentional and willful; that they were calculated to cause damage to the Counterclaimants in their business; were done with the unlawful purpose of causing damage and loss without right of justifiable cause on the part of the Defendant, therefore being malicious, and that actual damage and loss resulted. ... In the facts before this Court, a stronger than prima facie case was made based on the fact that the evidence shows a threat was made to sue the former employees of ACI if they formed a business and went in competition with them, but they did not sue if the former employee went to work for another competitor, and they did in fact sue Messrs. Watson and Settles, as promised.... [T]he evidence clearly showed an abuse of process, and that the process was abused to maliciously interfere with the business of the Counterclaimant.
(emphasis added) (citations omitted)
The chancellor covered all of the required elements in finding abuse of process and tortious interference with a business relationship. The difficulty in determining what constitutes a trade secret is evident. Cataphote, 316 F. Supp. at 1123. This Court holds that the chancellor did not manifestly err or abuse his discretion in finding that ACI's actions were malicious and constituted an abuse of process.

VI.
ACI contends that the lower court committed manifest error in awarding nominal damages to Metaplex, and such action was not supported by substantial evidence.
The Chancellor held that Metaplex was entitled to damages since ACI and the Pattersons abused the process of the court to unlawfully interfere with Metaplex and its business relations. Metaplex, as noted by the Chancellor, had difficulty in proving actual damages. The Chancellor, however, determined that Metaplex did suffer actual damages and awarded $100 as nominal damages.
ACI contends that the lower court erred in awarding nominal damages while at the same time awarding compensatory and punitive damages. ACI further alleges that the opinion itself indicates that the Chancellor was confused as to the determination of damages.
The question now in this case is where were the damages proved.
... .
With the difficulty of proving damages, the main element that can be shown is the attorney's fees and costs of litigation, which both sides have done in this case, and since there was an intentional or malicious act, such costs and fees may be considered as elements of compensatory damages.
*1202 In Southland Co. v. Aaron, 224 Miss. 780, 80 So.2d 823 (1955), this Court held:
Nominal damages are usually considered as a small and trivial sum awarded for a technical injury due to a violation of some legal right, and as a consequence of which some damages must be awarded to determine the right... . On the other hand "actual damages" is synonymous with "compensatory damages" and are substantial as distinguished from nominal.
Id. at 786-87, 80 So.2d at 826.
As noted above, nominal damages were awarded as well as compensatory or actual damages. In Williams v. Wiggins, 285 So.2d 163 (Miss. 1973), this Court held, "[N]ominal damages ... can only be granted in the absence of actual injury in cases of intentional tort." Id. at 164-65.
Settles testified on direct examination that after filing of this suit, ACI issued a subpoena on Hughes Aircraft, a customer of Metaplex, requesting information relating to any purchase of chemicals from Metaplex. After receiving the subpoena, Metaplex did not receive any new orders from Hughes Aircraft. Furthermore, Settles' credit line was frozen by the bank after the suit was filed, and he was refused an opportunity to solicit business by at least three potential customers. Thus, Metaplex incurred actual damages.
Upon review of the Chancellor's opinion, it is apparent that the nominal damage award relates to the inability to place a dollar amount on Metaplex's loss of business. The actual damage award represents attorney's fees and the expense of litigation. The award of nominal damages was error according to Williams. In cases of intentional tort, nominal damages can only be awarded in the absence of actual injury. Id. at 164-65. Since, the Chancellor awarded Metaplex actual damages in the form of attorney's fees, the award of nominal damages is reversed and rendered.

V.
The remaining issues raised by ACI on appeal are devoid of merit and do not warrant discussion. Therefore, the chancellor's decision is affirmed on these issues.

VI.
The chancellor did not commit manifest error in finding that ACI failed to meet its burden of proof on all counts of its complaint. Furthermore, the chancellor did not manifestly err or abuse his discretion in finding that ACI's actions were malicious and constituted an abuse of process. The chancellor's opinion and findings of fact were supported by the evidence and testimony of the witnesses and should not be disturbed. The award of punitive damages, and attorney's fees is affirmed. The award of nominal damages is reversed and rendered.
AFFIRMED IN PART, REVERSED AND RENDERED IN PART.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, BANKS, McRAE, ROBERTS and SMITH, JJ., concur.
NOTES
[1] The definition of a trade secret is now codified in Miss. Code Ann. § 75-26-3(d) (Rev. 1991). The somewhat modified definition became effective on July 1, 1990. Since the facts of this case arose prior to the enactment of § 75-26-3(d), the new statutory definition does not affect our decision this day.